**Dale S. BOGUS, Appellant,**

v.

**AMERICAN SPEECH & HEARING ASSOCIATION.**

**No. 77–1984.**

United States Court of Appeals, Third Circuit.

Argued March 30, 1978.

Decided July 19, 1978.

As Amended Sept. 27, 1978.

---

Carl T. Bogus, Steinberg, Greenstein, Gorelick & Price, Philadelphia, Pa., for appellant.

Lipman Redman and Dorothy Sellers, Melrod, Redman & Gartlan, Washington, D. C., Michael M. Baylson, Duane, Morris & Heckscher, Philadelphia, Pa., for appellee.

Before ADAMS, VAN DUSEN and RO-SENN, Circuit Judges.

## OPINION OF THE COURT

VAN DUSEN, Circuit Judge.

Dale Bogus, a speech pathologist and member of the American Speech and Hearing Association (ASHA), brought suit on April 2, 1974, in the district court challenging ASHA's rule requiring the maintenance of membership in ASHA as a prerequisite

to applying for, receiving, and retaining a Certificate of Clinical Competence (CCC) which ASHA issues to qualifying members. Plaintiff's complaint alleges that ASHA's membership prerequisite rule for a CCC constitutes an unlawful tying arrangement in violation of §§ 1 and 2 of the Sherman Act. 15 U.S.C. §§ 1, 2 (1976), and of the common law. The complaint, as amended, requests an injunction under § 16 of the Clayton Act, 15 U.S.C. § 26 (1976), barring ASHA's membership prerequisite rule and requiring ASHA to give appropriate notice of the abolishment of its rule. The complaint also seeks to recover under § 4 of the Clayton Act, 15 U.S.C. § 15 (1976), treble damages in the amount of membership fees and dues paid during the four years preceding the filing of the complaint and reasonable attorney's fees. Finally, the plaintiff sought certification of her action under Rule 23(b)(3) of the Federal Rules of Civil Procedure on behalf of herself and the class of all ASHA members.

The District Court for the Eastern District of Pennsylvania, by order of August 7, 1975 (51a), denied plaintiff's motion for class action certification on the ground that the prerequisites for certification specified in Rule 23(a)(4) and (b)(3) had not been satisfied. See *Bogus v. American Speech & Hearing Ass'n*, 20 F.R.Serv.2d 859 (E.D.Pa. 1975). Nearly a year later, on June 17, 1976, three audiologists filed a motion to intervene as plaintiffs, intending to ask for reconsideration of the class action request. After discovery, each party filed a motion for summary judgment. By order of March 24, 1977 (209a), the district court denied plaintiff's motion for summary judgment because of the existence of numerous factual disputes in connection with her claim. By memorandum and order dated May 5, 1977 (210–19a), the district court granted summary judgment for the defendant on plaintiff's claims under the federal antitrust laws and dismissed the remaining common law claim for lack of pendent juris-

diction. The district court held, on the basis of the record before it, that plaintiff's employment experience and prospects were such as to deny her standing to seek either damages or an injunction under the antitrust laws. The district court did not formally act on the intervention application.

Mrs. Bogus appeals from each of the aforementioned district court orders, as well as its failure to act on the motion to intervene. We first consider plaintiff's standing to sue under the federal antitrust laws. We address each of the other district court orders in turn.

I.

A.

ASHA is a non-profit professional association of speech pathologists and audiologists[1] formed in 1925 and incorporated in 1947. In 1974, when plaintiff's complaint was filed, ASHA boasted membership of over 20,000 professionals (125a). ASHA's members are employed principally in schools, universities, clinics, hospitals, laboratories, and rehabilitation centers. Others pursue private practice. Among other activities, ASHA publishes several journals, accredits college and clinical programs, sponsors education and recruitment programs for its members, represents its membership before legislatures and government agencies, and promulgates a code of professional ethics (111–16a). ASHA's activity which is at the center of this case is the association's professional certification program. ASHA awards its CCC to members who meet specified requirements of academic training, clinical experience and performance on a national examination. Certification may be obtained in either audiology or speech pathology or both fields. While ASHA does not require its members to seek a CCC, its Code of Ethics, § A(1)(c), admonishes that "the Member who is uncertified must not engage in private practice" (101a).

---

1. Speech pathology and audiology are separate disciplines. Pathologists, popularly referred to as therapists, work with speech defects. Audiologists specialize in hearing disorders. Some professionals may specialize in both fields. Mrs. Bogus was a speech pathologist. For purposes of this opinion, we can refer to these fields interchangeably.

Moreover, professionals who engage in clinical work are expected to meet the qualifications of the certification program. *Id.* § A(1).[2]

Many employers specify the CCC as a job prerequisite or as a preferred credential.[3] The district court, in its opinion granting summary judgment for the defendant, found that "the CCC is a professional necessity in some employment submarkets of the speech pathology profession and that it is a recognized symbol of competence within the profession." *Bogus v. American Speech and Hearing Ass'n,* Civil No. 74–849, slip op. at 2 (E.D.Pa., May 5, 1977) (211a). This statement fairly assesses the significance of the CCC to the speech pathology profession on the basis of this record.[4]

ASHA certifies only dues paying members. In fact, ASHA will consider initial applications for a CCC only from members of the association. *See* "Requirements for the Certificates of Clinical Competence," ASHA brochure effective March 1, 1975, plaintiff's Exhibit P–3 (103–04a). Members may formally apply after completing their required academic training, which includes a prescribed curriculum and a clinical practicum involving supervised clinical experience. In addition to joining ASHA and completing the education requirements, applicants for a CCC must serve a "clinical fellowship year" in their specialty and pass the national examination in that field be-

fore finally receiving their certification. *Id.* Given this application and certification sequence, ASHA encourages prospective speech pathologists to apply for association membership while still in school and prior to their filing of an application for the CCC. "Certification Questions and Answers," ASHA brochure dated January 1973, plaintiff's Exhibit P–16 (136–37a).

Satisfaction of all the professional standards, coupled with membership in ASHA, entitles a speech pathologist to receive a CCC. However, retention of the CCC is dependent on the holder's remaining a dues paying member· in good standing of ASHA. Delinquency in paying dues cancels certification and requires the former holder to reapply for a CCC. ASHA By-Laws, 1975, Art. IX, § 2, plaintiff's Exhibit P–1 (98a).

Dale Bogus attended Syracuse University, where she received a B.S. degree in Speech Pathology and Audiology in 1972 and a M.S. degree in Speech Pathology in December 1973. The same month that she earned her Master's degree, she applied for her CCC. In February 1974 she received from ASHA acknowledgment of receipt of her application for a CCC, as well as notice that it would not be processed until she submitted a membership application fee and annual dues. Plaintiff's Exhibit P–19 (142a). Mrs. Bogus paid the required fees and dues,[5] and in April 1974 she was in-

---

2. Documents submitted to the district court indicate that in 1974 approximately 70% of ASHA members held a CCC and, of the remaining members, most intended to seek a CCC after completing their applications and passing the national examination (125–26a). *See* Affidavit of M. Gail Hughes, May 5, 1975.

3. Employment advertising in *ASHA,* the association's monthly journal, predominantly referred to the CCC as a requirement or preference (170a). Similarly, employment advertising in the *New York Times* and *Philadelphia Inquirer* newspapers more often than not listed the CCC as a requirement for applicants (172–76a).

4. Although the CCC is a generally recognized symbol of competence, it is not the only professional credential which ASHA issues. ASHA will evaluate the education and clinical experience of non-members and issue a so-called "equivalency statement," signifying that the

non-member meets the educational requirements for certification and is, therefore, eligible to participate in various federal health care programs. *See,. e. g.,* 20 C.F.R. § 405.1225. While this equivalency statement may be helpful to speech pathologists desiring to participate in federal programs which require it, there is insufficient evidence on this record to find that it is comparable to the CCC. In fact, only a handful of equivalency statements are issued each year.

5. In an affidavit she filed, Mrs. Bogus stated: "I became a member of ASHA in order to be eligible to apply for and receive certification. Although I did contemplate this litigation at the time I joined ASHA, I would have joined ASHA in order to become certified irrespective of this litigation." Affidavit of Dale S. Bogus, ¶ 5, May 19, 1975 (27a).

formed that ASHA approved her academic course work and supervised clinical practicum and that she had only to pass the national examination and to complete her clinical fellowship year to qualify for a CCC. Plaintiff's Exhibit P–20 (143a). On June 20, 1975, Mrs. Bogus was notified that she had passed the national exam and that her CCC was granted and would remain valid "as long as [she] remain an ASHA member in good standing." Letter from Chairman, Clinical Certification Board of ASHA, to Mrs. Bogus dated June 20, 1975, plaintiff's Exhibit P–21 (144a). Mrs. Bogus has maintained her membership by annually paying her dues, which in 1978 are $95.00. Plaintiff's Exhibit P–147 (167a). Her CCC remains valid.

From July 1973 until August 1975, when she took maternity leave, plaintiff worked part-time as a speech therapist at the Bryn Mawr Hospital Rehabilitation Center in Malvern, Pa. According to her supervisor at the Rehabilitation Center, Mrs. Bogus was not required to have a CCC to work as a part-time speech therapist. Affidavit of Rance McIntyre, ¶ 5, Sept. 25, 1975 (89a). Nevertheless, Mrs. Bogus inquired of the supervisor on accepting the position as to whether she would be able to satisfy the clinical fellowship requirements for her CCC by working at the Rehabilitation Center. Id. ¶ 6.[6] While working part-time at the Rehabilitation Center, Mrs. Bogus also began working part-time at the Broomall Nursing Home. However, Mrs. Bogus left the employ of the Home because she was unsupervised while working there and, therefore, could not satisfy the clinical fellowship supervision requirement for her CCC. Deposition of Dale S. Bogus, Oct. 21, 1975, N.T. 12–13.

Mrs. Bogus has not returned to work at the Rehabilitation Center since taking maternity leave in August 1975. As evidence of her future employment plans, Mrs. Bogus filed the following affidavit on July 12, 1976:

"I am the plaintiff in the above-styled action. Since giving birth to a daughter in October of last year, I have devoted all of my time to caring for her and I have not worked in my profession. However, I have never intended to abandon my profession of speech pathology and I have always intended to return to clinical practice. I presently specifically intend to develop a part-time, private practice beginning this fall, and I have so intended for a number of weeks. I hope to see patients referred to me by physicians, hospitals, extended care facilities, or other speech pathologists, and particularly hope to see patients suffering from aphasia. Some weeks ago I made inquiries concerning use of an office for this purpose."

## B.

The district court held that Mrs. Bogus suffered no injuries by reason of ASHA's membership prerequisite rule and hence that she lacked standing to sue for damages under § 4 of the Clayton Act, 15 U.S.C. § 15 (1976). Section 4 authorizes private treble damage suits by "[a]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws . . . ." The doctrine of standing as applied to antitrust cases limits the apparent breadth of this provision by elaborating a concept of proximate causation between defendant's unlawful act and plaintiff's out-of-pocket losses. *Bogosian v. Gulf Oil Corp.*, 561 F.2d 434, 447 n.6 (3d Cir. 1977), *cert. denied*, 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978). *See generally* 2 P. Areeda & D. Turner, *Antitrust Law* §§ 333–34 (1978); L. Sullivan, *Antitrust* § 247 (1977). A court's task under the rubric of standing is not to determine whether a business practice violates the antitrust laws but whether a particular plaintiff may recover damages from the effects of the arguably unlawful practice on him or her. In this case the complaint alleges as an unlawful practice ASHA's

---

**6.** Mrs. Bogus did in fact satisfy the clinical fellowship requirement for the CCC by working

as a part-time supervised speech therapist at the Rehabilitation Center.

membership prerequisite rule for obtaining and retaining a CCC. The standing issue raised by defendant's motion for summary judgment is not whether ASHA's membership prerequisite rule is an illegal tie-in. The issue is properly framed as whether, on the basis of the Rule 56 submissions in this case, the plaintiff has shown on the record sufficient injury in fact to her business or property by reason of ASHA's membership prerequisite rule to maintain standing to challenge the legality of the rule.

[3, 4] Plaintiff's complaint seeks as damages her expenditures to become and remain a member of ASHA. There is no dispute on this record as to either the fact of payment of membership fees and dues or their amount. Such out-of-pocket expenditures paid directly to the defendant clearly constitute an injury in fact. In general, the purchase of the "tied product," ASHA membership, in conjunction with the purchase of the "tying product," the CCC, satisfies the injury-in-fact component of the purchaser's standing to challenge the tie-in.

[5, 6] Plaintiff purchased both of her CCC and membership in ASHA in the furtherance of her professional career. The cost of the CCC represents a business-related cost and, under plaintiff's theory of an illegal tie-in, ASHA's membership prerequisite rule increased the cost of obtaining and retaining the CCC. Increases in the cost of doing business, or, as in this case, increases in the cost of practising a profession, qualify as injury to "business or property" within the meaning of § 4 of the Clayton Act.[7] *See Barry v. St. Paul Fire & Marine Ins. Co.,* 555 F.2d 3, 12 n.7 (1st Cir. 1977), *aff'd,* —— U.S. ——, 98 S.Ct. 2923, 57 L.Ed.2d 932 (1978).[8] *See also Chattanooga Foundry & Pipe Works v. Atlanta,* 203 U.S. 390, 396, 27 S.Ct. 65, 51 L.Ed. 241 (1906); *Cleary v. Chalk,* 159 U.S.App.D.C. 415, 488 F.2d 1315, 1319 n.17 (1973), *cert. denied,* 416 U.S. 938, 94 S.Ct. 1940, 40 L.Ed.2d 289 (1974); L. Sullivan, *supra* 771 n.3.

The crux of this case is whether plaintiff's expenditures for membership in ASHA are "by reason of" ASHA's allegedly unlawful tie-in as contained in its membership prerequisite rule. The district court implicitly construed the statutory requirement that plaintiff's injury be caused by the alleged violation of the antitrust laws as demanding in this case record evidence that plaintiff " 'ha[s] been coerced into membership in ASHA by the professional necessity of having a Certificate of Clinical Competence.' " *Bogus v. ASHA,* Civil No. 74–849, slip op. at 4 (E.D.Pa., May 5, 1977).[9] The district court found no record evidence that Mrs. Bogus had either sought jobs requiring a CCC or been offered employment contingent upon her holding a CCC. Thus, the district court inferred that plaintiff had

---

**7.** In *Hawaii v. Standard Oil Co.,* 405 U.S. 251, 264, 92 S.Ct. 885, 892, 31 L.Ed.2d 184 (1972), the Supreme Court concluded that "the words 'business or property,' . . . refer to commercial interests or enterprises." Just as the Court recognized the standing of states to recover damages to their commercial interests but not to their general economy, *id.,* it follows that a professional has standing to recover for injuries to his commercial practice. A professional's status as an employee, rather than as a self-employed practitioner, is not in itself an impediment to standing under § 4. *See Bravman v. Bassett Furniture Inds., Inc.,* 552 F.2d 90, 98 & n.19 (3d Cir.), *cert. denied,* 434 U.S. 823, 98 S.Ct. 69, 54 L.Ed.2d 80 (1977); P. Areeda & D. Turner, *supra* ¶ 338.

**8.** In *Barry,* the Court of Appeals for the First Circuit upheld the standing of doctors who were challenging under the antitrust laws an alleged conspiracy by medical malpractice insurers to shrink the coverage available to all doctors in Rhode Island. The court recognized that the change in malpractice insurance coverage increased physicians' costs of practice.

**9.** The district court quoted from paragraph 20 of plaintiff's complaint, which made this allegation (10a). While this theory of membership in ASHA coerced by professional necessity of having a CCC was advanced in the complaint as a basis for liability, it did not furnish an exclusive theory of liability. In a brief filed with the district court in support of her motion for summary judgment, plaintiff argues that she need only prove the desirability or uniqueness of the CCC, rather than its necessity, in order to prevail on liability. Memorandum of Law in Support of Plaintiff's Motion for Summary Judgment, 18–31. This latter position is not inconsistent with a liberal reading of plaintiff's complaint. *See Bogosian, supra* at 444–47.

no professional necessity for a CCC and that her dues-paying association with ASHA was entirely voluntary. The district court concluded:

"Since plaintiff Dale Bogus was not herself coerced into ASHA membership by the professional necessity of having a CCC, her out-of-pocket losses [membership dues and the initiation fee] were not sustained 'by reason of' ASHA's membership practices, and accordingly she lacks standing to challenge these practices."

[7, 8] We believe that the plaintiff in this case need not demonstrate a professional necessity for the CCC in her own prior work experience in order to withstand a motion for summary judgment and to maintain standing to challenge the legality of ASHA's membership prerequisite rule. A direct purchaser who demonstrates a legitimate economic or business interest in purchasing a desirable or unique tying product or service and who is thereby compelled to purchase as well a tied product or service has standing to challenge the legality of the tie-in. On this record there is sufficient material evidence that plaintiff had a legitimate professional interest in acquiring a CCC at the time she applied for it and first joined ASHA.

This court has repeatedly eschewed formulation of a generally applicable conceptual test for the antitrust standing requirement that plaintiff's injury be caused "by reason of anything forbidden in the antitrust laws." Rather, we have consistently adverted to the variety and variability of factors which may be relevant in the factual situation of each particular case. *Bravman v. Bassett Furniture Inds., Inc.,* 552 F.2d 90, 96–100 (3d Cir.), *cert. denied,* 434 U.S. 823, 98 S.Ct. 69, 54 L.Ed.2d 80 (1977); *Cromar Co. v. Nuclear Materials & Equipment Corp.,* 543 F.2d 501, 505–10 (3d Cir. 1976). This court's precedents counsel consideration of such factors as plaintiff's rela-

tionship to defendant, the directness of injury, plaintiff's position in the area of the economy threatened by the alleged unlawful acts, and congressional policies underlying the treble damage and liability provisions of the antitrust laws. *Bravman, supra* at 99–100; [10] *Cromar, supra* at 508–09.[11]

Plaintiff in this case directly purchased both the CCC and membership rights from the defendant, ASHA. Plaintiff's injury in the sense of higher costs to obtain a CCC was direct. Plaintiff was situated in the center of the area of the economy in which ASHA's alleged unlawful acts operated. In short, Mrs. Bogus stands as a purchaser of a tying product, CCC, and a tied product, ASHA membership, from the defendant. The remaining factor to consider in this case is whether Mrs. Bogus' standing is consistent with the substantive law of tie-ins. We undertake this consideration not to prejudge the evidence of defendant's liability but rather to insure that the standing decision is consistent with liability standards that would be applied at trial.

The Supreme Court in *Northern Pacific Railway Co. v. United States,* 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958), prescribed the elements of a *per se* unreasonable tie-in which violates the Sherman Act. First, the tie itself must be established by reference to an agreement conditioning the sale of the tied product to separate purchase of the tying product. *Id.* at 5, 78 S.Ct. 514. Second, a "not insubstantial" amount of commerce must be affected. *Id.* at 6, 78 S.Ct. 514, 518. Third, the seller must have "sufficient economic power with respect to the tying product to appreciably restrain free competition in the market for the tied product." *Id.* These three elements of *per se* illegal tie-ins are well established in subsequent Supreme Court decisions, as well as within this circuit. *See Fortner Enterprises, Inc. v. United States*

---

**10.** *Bravman* recognized the standing of a manufacturer's sales representative to challenge the terms of his employment with the defendant manufacturer on the grounds that exclusive dealing requirements and territorial limitations violated both §§ 1 and 2 of the Sherman Act.

**11.** *Cromar* recognized the standing of a participant in the wood-plastic industry as a producer in competition with a manufacturer accused of monopolizing the industry.

*Steel Corp.,* 394 U.S. 495, 498–99, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969); *United States v. Loew's Inc.,* 371 U.S. 38, 45, 83 S.Ct. 97, 9 L.Ed.2d 11 (1962); *Bogosian, supra* at 449; *Ungar v. Dunkin' Donuts of America, Inc.,* 531 F.2d 1211, 1223–24 (3d Cir.), *cert. denied,* 429 U.S. 823, 97 S.Ct. 74, 50 L.Ed.2d 84 (1976). Even if a plaintiff fails to meet the standards of *per se* illegality, she or he may prevail on the merits by providing that a tie-in unreasonably restrains competition in violation of the more general standards of the Sherman Act. *Fortner Enterprises, supra,* 394 U.S. at 500, 89 S.Ct. 1252.

The district court in this case proceeded on the premise that for standing purposes the plaintiff must demonstrate a necessity for purchase of the tying product and coercion into purchase of the tied product. Such requirements imposed under the rubric of standing would constrict the aforementioned well settled standards governing the legality of tie-ins. Consequently, we believe the district court erred in applying its test for standing in this factual context.

*Bogosian,* which was decided by this court after the district court granted summary judgment in this case, explicitly rejected a liability rule requiring that every plaintiff prove coercion of his purchase of the tied product. *Bogosian* held that a plaintiff need prove coercion of his or her purchase of the tied product only if there is no evidence of the existence of an express tie-in. Proof that a seller expressly conditioned the sale of one product upon the purchase of another suffices as proof of the existence of a tie-in without further evidence of coercion. In the absence of proof of such an express condition, however, the existence of a tie-in may be deduced from evidence of coercion or leverage in the tied product market. 561 F.2d at 449–51. *See also Ungar, supra* at 1224. In this case there is no dispute as to the fact that ASHA expressly conditioned the award and purchase of a CCC on the purchase of a tied product, ASHA membership. No additional proof of coercion over the tied product market would be necessary to prove the existence of a tie-in for liability purposes; consequently no such proof is necessary for standing purposes.

The district court's ruling on standing was not drawn from the liability standard that a not insubstantial amount of interstate commerce be affected. We believe that plaintiff has standing to prove this element of liability in further proceedings. The third element of a *per se* illegal tie-in concerns the sufficiency of the seller's economic power over the tying product. The district court in this case in effect imposed a liability requirement under the guise of standing that plaintiff demonstrate a necessity for the purchase of the tying product, the CCC. Such a standing threshold conflicts with the Supreme Court's lower liability standard that extends to sellers who exercise merely "sufficient economic power" in the tying product market. The Court in *Fortner Enterprises* elaborated this liability prerequisite:

> "The standard of 'sufficient economic power' does not . . . require that the defendant have a monopoly or even a dominant position throughout the market for the tying product. Our tie-in cases have made unmistakably clear that the economic power over the tying product can be sufficient even though the power falls far short of dominance and even though the power exists only with respect to some of the buyers in the market. *See, e. g., International Salt [International Salt v. U. S.,* 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20]; *Northern Pacific; United States v. Loew's Inc.,* 371 U.S. 38, 83 S.Ct. 97, 9 L.Ed.2d 11 (1962). As we said in the *Loew's case,* 371 U.S., at 45, 83 S.Ct. 97: 'Even absent a showing of market dominance, the crucial economic power may be inferred from the tying product's desirability to consumers or from uniqueness in its attributes.' "

394 U.S. at 502–03, 89 S.Ct. at 1258.

For standing purposes in a tie-in case, the plaintiff need not prove the necessity of her purchase of the tying product. Rather, to withstand a motion for summary judgment, the plaintiff need only show that

there is a genuine issue as to the material fact of the desirability or uniqueness of the tying product to her. Such a standing inquiry does not predetermine the issue of liability because, for standing purposes, a plaintiff need show only the personal demand for, or uniqueness of, the tying product. To establish liability, the plaintiff must prove the defendant exercised sufficient economic power in the market as a whole for the tying product.

■ On this record there is sufficient evidence that Mrs. Bogus viewed the CCC as a desirable and unique product when she applied for it and, therefore, she should not be denied standing on a motion for summary judgment. Only ASHA awards a CCC. Moreover, alternative credentials of professional competence are not widely recognized. While all jobs in the speech pathology profession may not require a CCC, young professionals entering the job market could reasonably expect possession of the CCC to be uniquely valuable at some time in their career. The record in this case reveals that ASHA encourages all degree candidates in speech pathology and audiology to apply for their CCC on completion of their degree requirements. Mrs. Bogus applied for a CCC and the required membership in ASHA promptly on obtaining her Master's degree. She did so believing that "[f]ull professional recognition in my field requires certification by the American Speech and Hearing Association . . ." Affidavit of Dale S. Bogus, May 19, 1975, ¶ 4 (27a). ASHA's own Code of Ethics, which required clinical and private practitioners to hold the CCC, may have reinforced Mrs. Bogus' desire to obtain a CCC. Once she received her CCC, even if she did not currently need it to retain particular jobs, the plaintiff would not have desired the CCC to lapse for her failure to pay dues. In that event, if Mrs. Bogus were in the future to need a CCC as an employment prerequisite, she would have to reapply for the CCC. In short, at the time of her application, with a potential lifelong career as an active professional ahead of her, Mrs. Bogus legitimately and reasonably believed the CCC was desirable and unique.[12]

■ We conclude that to deny Mrs. Bogus standing on the record in this case would unduly constrict the liability standards enunciated in *Northern Pacific, Fortner Enterprises* and *Bogosian*. We do not presage acceptance of plaintiff's theory or proof of liability or her entitlement to damages as prayed for in her complaint. We hold only that where, as in this case, there is record evidence of a purchaser's reasonable and legitimate economic interest in a product or service which is expressly tied to another product, the purchaser has standing under § 4 of the Clayton Act to challenge the legality of the tie-in.[13]

### C.

[17, 18] Section 16 of the Clayton Act, 15 U.S.C. § 26, authorizes injunctive relief for any person who demonstrates "threatened loss or damage by a violation of the antitrust laws." This provision imposes a lower threshold standing requirement than § 4 of the Clayton Act. L. Sullivan, *supra* at 772. Section 16 has been applied more expansively, both because its language is less restrictive than that of § 4, *see Hawaii v. Standard Oil Co.*, 405 U.S. 251, 260–61, 92

---

**12.** There is no record evidence that plaintiff was illegitimately motivated by a desire to pursue this litigation. Mrs. Bogus has attested to the contrary. *See* note 5, *supra*. Moreover, plaintiff's employment record indicates a professional, rather than a litigious, interest in obtaining a CCC. When she accepted the position at Bryn Mawr Rehabilitation Center, she intended to fulfill the clinical fellowship requirement for the CCC. Similarly, Mrs. Bogus resigned her position at Broomall Nursing Home because her unsupervised clinical work would not satisfy the clinical fellowship requirement.

**13.** The parties have assumed that in this case the same standing principles of § 4 of the Clayton Act are applicable to alleged violations of both §§ 1 and 2 of the Sherman Act. We agree and, therefore, recognize plaintiff's standing to pursue both theories of liability. Moreover, in reinstating plaintiff's standing to pursue her federal claims, there now exists a basis for pendent jurisdiction over her state common law claim.

S.Ct. 885, 31 L.Ed.2d 184 (1972), and because the injunctive remedy is a more flexible and adaptable tool for enforcing the antitrust laws than the damage remedy, *see id.* at 261–62, 92 S.Ct. 885; *Zenith Corp. v. Hazeltine,* 395 U.S. 100, 131, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969). A party with standing under § 4 ordinarily will have standing under § 16. *Tugboat, Inc. v. Mobile Towing Co.,* 534 F.2d 1172, 1174 (5th Cir. 1976); P. Areeda & D. Turner, *supra,* § 335e. In this case, the plaintiff has alleged an existing violation of the antitrust laws which is likely to continue with continued resulting injury to her, and she, therefore, has standing to assert claims for injunctive relief under § 16, as well as for damages under § 4.

## II.

Having determined that the plaintiff has standing under §§ 4 and 16 of the Clayton Act to seek individual relief in the district court from the antitrust violations asserted in the complaint, we turn to consideration of the plaintiff's contention that the district court erred in denying her motion for class action certification.

In order to maintain a class action, the plaintiff must meet the mandatory requirements of Rule 23(a) of the Federal Rules of Civil Procedure [14] and, in addition, the requirements of at least one of the subsections of Rule 23(b). *Wetzel v. Liberty Mutual Insurance Co.,* 508 F.2d 239, 245, 248 (3d Cir.), *cert. denied,* 421 U.S. 1011, 95 S.Ct. 2415, 44 L.Ed.2d 679 (1975); *Katz v.*

*Carte Blanche Corp.,* 496 F.2d 747, 756 (3d Cir.), *cert. denied,* 419 U.S. 885, 95 S.Ct. 152, 42 L.Ed.2d 125 (1974). In reviewing the district court's denial of class action status, we are largely limited to a consideration of whether the court identified and applied the appropriate criteria in arriving at its decision. *Wetzel v. Liberty Mutual Insurance Co., supra* at 245; *Katz v. Carte Blanche Corp., supra* at 756–57. If we find that the court considered the relevant factors, the scope of our review becomes whether the court abused its discretion. *Paton v. La Prade,* 524 F.2d 862, 875 (3d Cir. 1975); *Wetzel v. Liberty Mutual Insurance Co., supra* at 245.

The plaintiff requested designation under Rule 23(a) and (b)(3) as the representative of a class of plaintiffs defined as "[a]ll those who have paid membership dues, membership application fees, spouse dues, or membership reinstatement fees to the American Speech and Hearing Association within the past four years and who have received, applied for, or indicated an intention to apply for a Certificate of Clinical Competence." The district court denied the plaintiff's motion on two grounds: (1) that the plaintiff had not satisfied the requirement of Rule 23(a)(4) that the named plaintiff adequately represent the interests of members of the class, and (2) that the plaintiff had failed to demonstrate, as is required under Rule 23(b)(3),[15] the superiority of a class action over other available methods of adjudicating the controversy.

---

14. Rule 23(a) provides:

"(a) Prerequisites to a Class Action. One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class."

15. Rule 23(b) provides in pertinent part:

"(b) Class Actions Maintainable. An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:

"(3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action."

■ We conclude that the district court properly identified and considered the relevant legal criteria and did not abuse its discretion in deciding that the plaintiff failed to demonstrate the superiority of a class action over other available means of adjudicating the controversy. Since we do not disturb the district court's denial of class action certification under Rule 23(b)(3), we do not reach the issues raised by the plaintiff with regard to the district court's rationale under Rule 23(a).

The district court gave the following reasons for its Rule 23(b)(3) determination: 1) the absence of litigation by other members of the proposed class, 2) the plaintiff's intention, expressed prior to the denial of class certification, to continue to press her claims regardless of the fate of the class action motion, 3) the existence of "a serious question" as to the adequacy of the named plaintiff and her counsel to represent the class, and 4) the burden which a "class action of this size" will impose on the judicial system.

■ Setting to one side the question of the adequacy of the plaintiff's representation, which we do not find it necessary to consider, the remaining factors cited by the district court in combination sufficiently support the exercise of discretion to deny class certification. In view of the plaintiff's manifested intention to continue her litigation even in the face of a denial of class certification, the district court was presented with a clear choice between a "test case" and a class action. *See Katz v. Carte Blanche Corp.*, 496 F.2d 747, 758–62 (3d Cir.), *cert. denied*, 419 U.S. 885, 95 S.Ct. 152, 42 L.Ed.2d 125 (1974). Since the complaint requested injunctive relief, the plaintiff's success on the merits would obtain for the potential class members the prospective relief available through a class action mechanism as well as eliminating any violation of the antitrust laws. And the *res judicata* effect of a finding that defendant's conduct is illegal would leave the potential class members in a position to avail themselves of a damage remedy. *See Katz, supra.* Moreover, given the availability of statutory attorneys' fees, and the relatively uncomplicated nature of the facts at issue, there is no reason to doubt the feasibility of plaintiff's avowed intention of continuing her suit with full vigor.[16] The interests of the potential class members thus do not counsel so strongly in favor of class certification as to compel reversal.

■ On the other side of the balance, as the district judge noted, maintenance of an action on behalf of the putative plaintiff class, numbering 20,000 members, would impose significant costs and burdens on the judicial system, as well as the defendant. And, while the issue is not determinative, there is no indication that a class action is necessary to effect a consolidation of a rash of vexatious or duplicative law suits brought by ASHA members.[17]

Given the clear availability of an alternative method for resolving the claims at issue, which has many of the advantages of a class action both for the plaintiff class and for the accomplishment of the purposes of the antitrust law, yet spares much of the expense and procedural complexity, we hold that the district court did not abuse its discretion in denying class certification.

### III.

■ Although we hold that plaintiff Bogus has standing to challenge the legality

---

**16.** We do not imply that a named plaintiff's intention to continue his or her litigation in the absence of class certification should be a decisive factor in the judicial determination of the "superiority" issue. The weight to be given a plaintiff's avowed intention to proceed with or to abandon the suit in the face of a denial of a class action certification will vary with the circumstances of each case and the presence of the other factors to be considered under Rule 23(b)(3). In this case, Mrs. Bogus' intention to continue her suit with full vigor was only one factor among several which the district court properly considered in denying the superiority of a class action.

**17.** We note that the existence of other litigation may also weigh against class certification to the extent that such actions betoken an interest in individual litigation. *See* Comments of Advisory Committee on Civil Rules, 39 F.R.D. 69, 104.

of ASHA's membership prerequisite rule, we do not believe that she is entitled to judgment as a matter of law on this record. Factual questions relevant to the various theories of liability remain concerning, *inter alia,* the sufficiency of ASHA's economic power in the market as a whole for CCCs, the anticompetitive purpose and effect of the challenged tie-in, questions of monopoly intent and power, and relevant product and geographic markets. Moreover, through further proceedings ASHA may be able to develop a factual basis for not automatically applying in this case liability concepts developed in the context of for-profit businesses. The Supreme Court has twice expressed the view that in certain circumstances a professional association's practices may be judged differently from other businesses.[18] We need not decide on this record whether ASHA's membership prerequisite rule may be treated differently under the Sherman Act than the ordinary commercial tie-in. It suffices for purposes of this appeal from a grant of summary judgment to note that material issues of fact remain to be developed in further proceedings. *See Poller v. Columbia Broadcasting,* 368 U.S. 464, 467, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962). To the extent that facts are disputed, all doubts are to be resolved in favor of the non-moving party. *Cantor v. Detroit Edison Co.,* 428 U.S. 579, 582, 96 S.Ct. 3110, 49 L.Ed.2d 1141 (1976); *Fortner Enterprises, supra,* 394 U.S. at 505, 89 S.Ct. 1252.

### IV.

By a motion filed June 17, 1976, three practicing audiologists sought permission under Rule 24(b) of the Federal Rules of Civil Procedure to intervene as party plaintiffs in the district court proceedings. Were their motion granted, the would-be intervenors intended to seek a rehearing of the district court's denial of class action certification. The plaintiff asserts on her appeal that the district court erred in failing to act upon the intervention motion prior to entering its order granting summary judgment in favor of the defendant.

Plaintiff's attorney concedes that the would-be intervenors have not taken an appeal from the district court's inaction in regard to their motion. The plaintiff, not being aggrieved by the district court's failure to act in this matter, does not have standing to raise the issue. *See Cobb v. Aytch,* 539 F.2d 297, 300 (3d Cir. 1976), *cert. denied,* 429 U.S. 1103, 97 S.Ct. 1130, 51 L.Ed.2d 554 (1977); *In re Glenn W. Turner Enterprises Litigation,* 521 F.2d 775, 781 (3d Cir. 1975). There being no proper party who has raised the question of the denial of intervention, it is not properly before us. Moreover, the question is rendered moot by our ruling set forth in part I of this opinion, which requires the reinstatement of the complaint. On remand the district court will have an opportunity to consider, in its discretion, the application for intervention under Rule 24(b).

### V.

ASHA has moved this court to strike the portion of the appellant's brief containing her statement of the facts on the ground that the same statement was submitted to the district court in support of her unsuccessful motion for summary judgment. We believe the appellant is entitled to present her version of the facts in her brief on appeal, whether in the form of a reproduction of a statement submitted to the district court or of a new presentation for purposes of the appeal. We therefore will deny the motion to strike portions of the appellant's brief.

---

**18.** The Supreme Court first suggested different antitrust considerations for professional associations' activities in *Goldfarb v. Virginia State Bar,* 421 U.S. 773, 778–79 n.17, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975). This past term, in *National Society of Professional Engineers v. United States,* 435 U.S. 679, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978), the Court rejected a professional engineers' association's claim that its canon of ethics prohibiting competitive bidding was entitled to a broad exemption from the Rule of Reason. However, the Court "adhere[d] to the view expressed in *Goldfarb* that, by their nature, professional services may differ significantly from other business services, and accordingly, the nature of the competition in such services may vary." *Id.* at 696, 98 S.Ct. at 1367.

## VI.

The district court's order of August 7, 1975, denying class action certification will be affirmed. The appellee's motion to strike portions of the appellant's brief will be denied. The district court's order of May 5, 1977, granting summary judgment to the defendant with respect to plaintiff's claims under §§ 1 and 2 of the Sherman Act and dismissing her common law claim, will be reversed and the case will be, accordingly, remanded to the district court for further proceedings.