Robert C. BLACKWELL, d/b/a Bob's Power Test of Elizabeth, individually, and for all other persons similarly situated, Plaintiffs,

v.

POWER TEST CORP., a Delaware corporation, Power Test Petroleum Distributors, Inc., a New York corporation, Staten Island Gasolines, Inc., a New York corporation, Power Test of New Jersey, Inc., a New Jersey corporation, John Doe and Richard Roe, Inc., Defendants.

Civ. A. No. 80–2227.

United States District Court, D. New Jersey.

Aug. 19, 1981.

**804**

Robert H. Jaffe, Springfield, N. J., for plaintiffs.

Sue C. Nussbaum, Wayne, N. J., for defendants.

## OPINION

MEANOR, District Judge.

This litigation was initiated by Robert C. Blackwell (Blackwell), d/b/a Bob's Power Test of Elizabeth, a franchisee and lessee of defendant State Island Gasolines, Inc. (SI Gasolines), in response to the attempted termination of plaintiff's franchise agreement and lease by defendant Power Test Petroleum Distributors, Inc. The matter is presently before the court on plaintiff's motion for class action certification and defendants' motion for dismissal pursuant to Fed.R.Civ.P. 12(b)(6) or, in the alternative, for summary judgment.[1] For the reasons set forth below, the court will grant the defendants' motion for summary judgment.

Since November 1978, Blackwell has leased and operated a gasoline retail sales outlet, d/b/a "Bob's Power Test", located in Elizabeth, New Jersey, pursuant to a lease agreement, Blackwell Afft., Exhibit B, with SI Gasolines. Plaintiff and SI Gasolines were also parties to a Retail Dealer Franchise Agreement, id., Exhibit A. Both agreements were effective as of November 17, 1978. Plaintiff also executed a Guaranty Agreement, id., Exhibit C, at this time, as well as a Dealer Disclosure Form, id., Exhibit D. Certain provisions in these various agreements are at the heart of this controversy and will be detailed shortly.

Until sometime in the latter part of May 1980, plaintiff adhered to the conditions and terms of his franchise and lease agreement. At that time, however, the price of gasoline plaintiff was required to purchase from the defendants or their designee, pursuant to the terms of the franchise and lease agreement, "began to cost as much as ten cents (10¢) per gallon in excess of the cost of similar quality gasoline from the distributors of major oil producers." Complaint ¶ 13, at 6. After two purchases from the defendants at this price, plaintiff began to purchase gasoline from other sources at prices ranging from $1.07 per gallon to $1.09 per gallon.

Shortly thereafter, on June 22, 1980, the defendants, Power Test of New Jersey, Inc. (PTNJ), and SI Gasolines sent a notice to all Power Test dealers enclosing a composite of the standard Power Test franchise agreement and related lease agreement, emphasizing those portions of these agreements which required the dealers to purchase gasoline from them as a condition of the lease and franchise. Id., Exhibit A. Paragraph 11 of the lease agreement, as highlighted by the defendants, indicates that a default of the lease occurs if and when "the lessee ... mixes any other brand or grade gasoline with Power Test gasoline in a storage tank connected to a dispensing pump on the premises or if lessee sells or holds out for a sale as a Power Test brand gasoline which is not a Power test brand gasoline." Id., Exhibit A, ¶ 11, at 2. The highlighted portions of the franchise agreement also dealt with the dealers' obligation to purchase gasoline from the defendants. In paragraph 1, dealers warrant to sell "only Seller's [SI Gasolines] gasoline." Id., Exhibit A, ¶ 1, at 2. More importantly, paragraph 15 of the franchise agreement, as reiterated in the Notice, reads:

> 15. Gasoline clause: Dealer does hereby covenant and agree that for and during the entire term, the Dealer shall not, nor permit any other, to store, handle, sell,

---

1. Since both parties have submitted matters outside of the pleadings for the court's consideration on this motion, it will be treated as a motion for summary judgment in accordance with Fed.R.Civ.P. 12(c).

offer for sale, advertise for sale, use or permit to be used upon the premises or any part thereof or adjacent thereto, any gasoline, oil or other petroleum products, other than supplied by the Seller or such company as the Seller shall designate.

It is further understood and agreed that the Dealer shall purchase or acquire from the Seller or such company as the Seller shall designate, *all his require-ments* of gasoline, oil or other petroleum products which are, or are to be, stored, handled, sold, offered for sale, advertised for sale *or sued upon the demised premis-es* or any part thereof or adjacent there-to, and he does, hereby, agree to pay at the time of delivery, unto the Seller, or such company as the Seller shall desig-nate, for such gasoline, oil or other petro-leum products is designated by the Seller, at the bulk plant from which deliveries are to be made to the demised premises.

The Dealer covenants and agrees that it will not . . . mix any other brand or grade of gasoline with Power Test gaso-line in a storage tank connected to a dispensing pump on the premises; and will not sell or hold out for sale as Power Test brand gasoline any gasoline which is not Power Test brand gasoline.

Should there be any breach in any of the provisions contained in this para-graph, the Seller shall have the right to terminate this contract on giving to the Dealer two (2) days notice . . . and the Dealer shall vacate the premises and Sell-er may recover possession of the premises by *summary proceedings or otherwise.*

*Id.,* Exhibit A, ¶ 15, at 3 (emphasis in origi-nal). The Notice also informed the dealers that the conditions of the franchise agree-ment and lease would be strictly enforced. *Id.,* Exhibit A, at 1.

Upon the receipt of this Notice, Black-well, through his counsel, informed the de-fendants by letter dated June 25, 1980, that their attempt to enforce the Gasoline Clause of the franchise agreement would constitute a violation of federal antitrust law, as well as the New Jersey Franchise Practices Act. Blackwell Afft., Exhibit F.

Although plaintiff expressed his continued desire to remain a Power Test franchisee, he indicated that he would take such legal action as necessary to assure uninterrupted possession of the premises. *Id.* at 2.

The defendants' response to this commu-nication was two-fold. In a letter dated July 1, 1980, legal counsel for PTNJ rebut-ted the numerous contentions of plaintiff that the franchise and lease agreement pro-visions were violative of the federal anti-trust laws. PTNJ also advised plaintiff's counsel that "the utilization of his market-ing facilities for the introduction and sale of gasoline other than that supplied by Power Test is in clear violation of the law." Blackwell Afft., Exhibit G, at 2. Further-more, PTNJ informed plaintiff's counsel that these acts by a dealer "will result in a termination." *Id.* Then, on July 15, 1980, defendant Power Test Petroleum Distribu-tors, Inc. (PT Distributors), served plaintiff with a notice of termination. The termina-tion was premised upon the assertion that plaintiff

stored, handled, sold, offered for sale, ad-vertised for sale and used or permitted to be used upon the premises a gasoline other than that supplied by Power Test Petroleum Distributors[,] Inc. or did mix another brand of gasoline with gasoline supplied by Power Test Petroleum Dis-tributors, Inc. in contravention of the terms of paragraph 11 of your Lease Agreement and paragraph 15 of your Re-tail Dealers Contract.

Blackwell Afft., Exhibit H. PT Distribu-tors also demanded that plaintiff vacate the premises by July 18, 1980.

On July 18, 1980, plaintiff instituted this present lawsuit, seeking injunctive relief and damages against the defendants for violations of sections 1 and 2 of the Sher-man Antitrust Act, 15 U.S.C. §§ 1 and 2, section 3 of the Clayton Act, 15 U.S.C. § 14, and section 102 of the Petroleum Marketing Practices Act, 15 U.S.C. § 2802. Jurisdic-tion was alleged under sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, section 105 of the Petroleum Marketing Practices Act, 15 U.S.C. § 2805, and 28

U.S.C. § 1337. For reasons that will become clear shortly, it is necessary to discuss in some detail the substantive allegations of the complaint.

After a description of numerous parties, plaintiff alleges that "[d]efendant Power Test is the parent corporation of subsidiaries [PT] Distributors, S. I. Gasolines and PTNJ." Complaint ¶ 4, at 2. Plaintiff also named as defendants certain fictitious individuals and entities. Specifically, plaintiff averred

> The identities of defendants John Doe and Richard Roe, Inc. are presently unknown and/or plaintiffs are presently without sufficient evidence to warrant naming such additional named defendants at this time. Plaintiffs reserve the right to amend this complaint if and when warranted by the obtaining of additional evidence which would justify the naming of additional named defendants after the commencement of discovery proceedings.

*Id.*, ¶ 5.

A variety of wrongs are alleged to have been perpetrated by the defendants. It is alleged that the plaintiff and the putative class members have suffered losses as a result of the enforcement of provisions in the franchise and lease agreements which require the purchase of gasoline at "artificially fixed prices." *Id.*, ¶ 6, at 3. It is also alleged that the defendants have engaged in an unlawful combination and conspiracy, "and have been parties to contracts, agreements and understandings", restraining interstate commerce and trade in the sale of gasoline. The five specific actions alleged are:

(1) defendants required that Blackwell and all other dealers "only purchase gasoline requirements from defendants", *id.*, ¶ 9(a), at 5;

(2) "[d]efendants . . . tied to a lease agreement a provision requiring plaintiff . . . to purchase all their gasoline requirements from defendants", *id.*, ¶ 9(b), at 5;

(3) defendants required that plaintiff purchase gasoline "at prices artificially fixed by them", *id.*, ¶ 9(c), at 5, which prices are greater than those on the open market;

(4) defendants sold their products to plaintiff upon the condition that plaintiff not purchase products from defendants' competitors, *id.*, ¶ 9(d), at 5; and

(5) "defendants . . . used their control over land in the form of gasoline sales outlets to coerce plaintiff . . . to purchase gasoline and other gasoline products only from defendants at fixed artificial prices higher than that in the open market", *id.*, ¶ 9(e), at 5.

Plaintiff then asserts that these actions of the defendants were willfully done for the purpose of attempting to monopolize the market for such products. Plaintiff contends that the termination of his franchise and lease agreement would cause irreparable harm and, thus, injunctive relief is appropriate. In addition to an injunction, plaintiff seeks treble damages, interest, costs and attorney's fees.

The second count asserts numerous violations of the Petroleum Marketing Practices Act, 15 U.S.C. § 2801 *et seq.* Under this count, plaintiff also seeks injunctive and monetary relief.

Upon filing his petition, plaintiff obtained, from another member of this court, a temporary restraining order, prohibiting defendants from terminating the lease and franchise agreement. The preliminary injunction hearing was set for July 22, 1980. On July 24, 1980, I determined that a preliminary injunction was inappropriate in this matter.[2] Accordingly, the restraint

---

2. During the preliminary injunction hearing the court drew to the attention of plaintiff's counsel the 60 day notice provision for termination of a franchise under the New Jersey Franchise Practices Act, N.J.S.A. 56:10–1 *et seq.* In light of the apparent applicability of the state act, the court extended to plaintiff the opportunity to amend his complaint to assert a violation of this act. Plaintiff declined the opportunity, believing that "the antitrust laws supersede the state regulation." PI Tr. 25–9. Reference to

lifted and the lease and franchise agreement terminated. Plaintiff vacated the premises on the close of that business day.

At the hearing on the preliminary injunction, I also determined that the Petroleum Marketing Practices Act was not applicable to this action. PI Tr. 2. Plaintiff conceded, as he must, during the course of oral argument for the preliminary injunction that no named defendant was engaged in the refining of petroleum. PI Tr. 2–14. This fact is also substantiated by the affidavit of Power Test's President submitted by the defendants. Liebowitz Afft. ¶ 1. For the sake of clarification and finality, I reiterate that earlier holding here.

■ The Petroleum Marketing Practices Act, 15 U.S.C. §§ 2801 to 2841 (PMPA), deals with three distinct marketing problems: franchise protection, octane disclosure requirements; and the subsidization of motor fuel marketing. Only the statutory guidelines involving franchise protection were allegedly involved in this matter. It is clear from a review of the definitional section of the subchapter that neither party is a "franchisee" or "franchisor" as defined within the PMPA, nor is their relationship a protected "franchise". The PMPA defines "franchise" as any contract between certain specified parties involving the sale, consignment or distribution of motor fuel where the retailer or distributor is permitted to use "a trademark which is owned or controlled by such refiner or by a refiner which supplies motor fuel to the distributor which authorizes or permits such use." 15 U.S.C. § 2801(1)(A). Likewise, "franchisee" and "franchisor" are defined in terms of relationships arising out of a PMPA-defined "franchise", id., § 2801(2)—(4), and, thus, incorporate the element of a refiner owned or controlled trademark. Furthermore, resort to the applicable Senate Report supports this interpretation. Senate Report No. 95–731 states:

> The term "franchise" is defined in terms of a motor fuel trademark license. It should be noted that the term is applicable only to the use of a trademark which is owned or controlled by a refiner.

the transcript of the preliminary injunction

S.Rep.No.95–731, 95th Cong., 2d Sess. 29, *reprinted in* [1978] *U.S.Code Cong. & Ad. News* 873, 888. Since it is undisputed that the "Power Test" trademark is not owned or controlled by a refiner, it is evident that the Petroleum Marketing Practices Act is not applicable to this action. Accordingly, the court will dismiss count two of the complaint.

## CLAIM OF ATTEMPTING MONOPOLIZATION IN VIOLATION OF SECTION 2 OF THE SHERMAN ANTITRUST ACT, 15 U.S.C. § 2

The principle contention relied upon by the defendant for summary judgment under this claim is that the "complaint is insufficient ... where plaintiff fails to make any effort to allege what defendants' share of the market is and to define that market geographically." Defendants' Brief at 11. Defendants also assert that they have no monopoly power since they have no control over the prices and competition in the market, assuming such market was adequately defined. *Id.* at 11–12.

Plaintiff responds by arguing that "a cursory reading of the complaint discloses that the economic and geographic area of activity is limited to the states in which defendants conduct business pursuant to standard lease and franchise agreements." Plaintiff's Brief at 18. Plaintiff also asserts that it is only necessary "to show a relevant market rather than its exact perimeters." *Id.* The defendants' ability to control prices and competition is alleged to arise from the "enforcement of the terms of this Franchise Agreement." *Id.* Finally, plaintiff requests the opportunity to engage in discovery to determine the sufficiency of the alleged section 2 violation. If discovery fails to substantiate the allegation, then defendants are free to move for summary judgment.

Plaintiff's arguments are not persuasive. Defendants' assertion of the pleading deficiencies by the plaintiff, *i.e.*, failure to plead

hearing is by "PI Tr.".

relevant product and geographic markets, is correct. Section 2 of the Sherman Antitrust Act provides:

Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, . . . shall be deemed guilty of a felony.

15 U.S.C. § 2. In *Mullis v. Arco Petroleum Corp.*, 502 F.2d 290 (7th Cir. 1974), the Seventh Circuit, in a thoughtful analysis, discussed the necessary elements of a section 2 violation:

Whether a complaint alleges monopolization or an attempt to monopolize, it is incumbent upon the plaintiff to define the relevant market in which the defendant's actions are to be appraised.[14] Since the statute has "both a geographical and distributive significance," *Indiana Farmer's Guide Publishing Co. v. Prairie Farmer Publishing Co.*, 293 U.S. 268, 279, 55 S.Ct. 182, 185, 79 L.Ed. 356, the market definition must include a description of both the territory encompassed and the produce involved.[15]

502 F.2d at 295. In footnotes 14 and 15, the Court further explained:

14. The critical importance of this requirement is identified by Chief Judge Swygert in the concluding portion of his opinion in Bernard Food Industries, Inc. v. Dietene Co.:

Section 2 of the Sherman Act proscribes an attempt "to monopolize any part of the trade or commerce among the several States." Judge Learned Hand succinctly stated the elements of a Section 2 violation: "In order to fall within § 2, the monopolist must have both the power to monopolize and the intent to monopolize." *United States v. Aluminum Co. of America*, 148 F.2d 416 (2d Cir. 1945). There is no evidence whatever to indicate that the defendant's conduct in publishing the comparison sheet manifested an intent to monopolize. Absent also is any evidentiary basis for holding that the defendant possessed the power to monopolize.

*Moreover, there is no proof of what constituted the relevant market. Without such a determination, the question of a monopoly or an attempt to accomplish such a goal could in no manner be meaningfully answered. A definition of the relevant market is an essential element of a violation under Section 2 of the Sherman Act.* United States v. Grinnell Corp., 384 U.S. 563, 570, 86 S.Ct. 1698 [1703] 16 L.Ed.2d 778 (1966).

415 F.2d 1279, 1284 (7th Cir. 1969), cert. denied, 397 U.S. 912, 90 S.Ct. 911, 25 L.Ed.2d 92 (emphasis added). In *Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.*, 382 U.S. 172, 177–178, 86 S.Ct. 347 [350–351] 15 L.Ed.2d 247, Justice Clark, speaking for the Court, made it clear that the basic importance of defining the relevant market is as applicable to an attempt case as to other § 2 claims. *See also Acme Precision Products, Inc. v. American Alloys Corp.*, 484 F.2d 1237 (8th Cir. 1973), holding at page 1242 that the burden of proof as to the relevant market rests upon the claimant.

15. The importance of defining the relevant "area of effective competition" was explained at pages 44–45 of the Report of the Attorney General's National Committee to Study the Antitrust Laws (1955) (footnotes omitted):

Whether monopoly power for purposes of Section 2 exists requires first a definition of the market within which it is to be measured. For the distinction between competition and monopoly turns on power in a relevant market. Although the word "market" does not appear in the statute, it is a necessary element of the concepts of monopoly and of certain restraints of trade upon which the statute rests.

The appropriate market is the "area of effective competition" within which the defendant or defendants operate. [*Standard Oil Co. of California v. United States*, 337 U.S. 293, 299–300 n.5 (69 S.Ct. 1051, 1055 n.5, 93 L.Ed. 1371)]. "The problem of defining a market

turns on discovering patterns of trade which are followed in practice." [*United States v. United Shoe Machinery Corp.*, 110 F.Supp. 295, 303 (D.Mass. 1953), aff'd per curiam, 347 U.S. 521 (74 S.Ct. 699, 98 L.Ed. 910) ]. Identification of markets required for solution of an antitrust problem is primarily one of fact. The starting point is to ascertain the actual competition to which the defendants are exposed, and the effect on rivals of the conduct they have undertaken. For these purposes, the market is normally identified both in terms of the trade in products, field or services affected by the conduct, and the geographical areas within which such trade may be limited. The Sherman Act, the Supreme Court said, in *Indiana Farmer's Guide Publishing Co. v. Prairie Farmer Publishing Co.* [293 U.S. 268, 279 (55 S.Ct. 182, 185, 79 L.Ed. 356) ], has "both a geographical and distributive significance and [it applies] to any part of the United States as distinguished from the whole and to any part of the classes of things forming a part of interstate commerce." The kind of market analysis which the Committee understood the statute to require was employed by the Supreme Court in *United States v. E. I. duPont de Nemours & Co.*, 351 U.S. 377, 389–396, 76 S.Ct. 994, 1003–1008, 100 L.Ed. 1264.

502 F.2d at 295 nn. 14 & 15.

■ The complaint in this action is totally devoid of any allegation with respect to either the product or geographic market. Furthermore, plaintiff's attempt to define these markets in his brief is inadequate at best. In his brief, plaintiff merely discusses the geographic market. No mention whatsoever is made of the relevant product market. Accordingly, the complaint fails to state a claim based upon an alleged violation of section 2 of the Sherman Antitrust Act. *See Essex Int'l, Inc. v. Industra Prods., Inc.*, 64 F.R.D. 361, 364 (N.D.Ind. 1974) (holding that plaintiff is required to allege "in realistically definitive terms the existence of monopoly power (through market share or otherwise) or the existence of a

dangerous proximity to achievement of monopoly"); *Coleman Motor Co. v. Chrysler Corp.*, 525 F.2d 1338, 1348 (3d Cir. 1975) (stating that "definition of the relevant market is . . . critical"); *Summey v. Ford Motor Credit Co.*, 449 F.Supp. 132, 141 (D.S. C.1976), *aff'd*, 573 F.2d 1306 (4th Cir. 1978). However, in light of the liberality under the Federal Rules accorded requests to amend the pleadings, the dismissal of this allegation should not hinge merely on a pleading deficiency.

Assuming that plaintiff were to allege both a product and geographic market, the allegation would be baseless once the evidential material submitted to the court is considered. In *Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.*, 637 F.2d 105 (3d Cir. 1980), the Third Circuit examined the elements of proof necessary to sustain a claim of attempted monopolization in violation of section 2. In that case, the Third Circuit explained:

To establish that Texaco gasoline alone constituted a relevant market or submarket, appellants had to prove that Texaco gasoline was not considered reasonably interchangeable with other brands of gasoline and non-branded gasoline by a significantly large number of consumers. *Brown Shoe Co. v. United States*, 370 U.S. 294, 325, 82 S.Ct. 1502, 1524, 8 L.Ed.2d 510 (1962); *United States v. E. I. duPont de Nemours & Co.*, 351 U.S. 377, 393, 395, 399–400, 76 S.Ct. 994, 1006, 1007, 1009, 100 L.Ed. 1264 (1956); *Columbia Metal Culvert Co. v. Kaiser Aluminum & Chemical Corp.*, 579 F.2d at 26–27. There must be evidence, for example, of "industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." *Brown Shoe*, 370 U.S. at 325, 82 S.Ct. at 1524; *Columbia Metal*, 579 F.2d at 27. . . .

The evidence mandates the conclusion that the range of commodities "reasonably interchangeable by consumers for

the same purposes" includes all brands of gasoline and that there are no product submarkets. By Sweeney's own assertion, gasoline is a fungible commodity. Sweeney itself continually bought gasoline from other refiners. Moreover, uncontradicted testimony indicated that Sweeney's gas stations competed not only with Texaco stations, but also with other brand and non-brand stations.... Paraphrasing the conclusion by Judge, now Justice, Stevens in *Mullis v. Arco Petroleum Corp.*, 502 F.2d 290, 296–97 (7th Cir. 1974) (footnote omitted): "Under the kind of economic analysis employed by both the majority and the dissent in *United States v. E. I. duPont de Nemours & Co.*, 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264, plaintiff clearly failed to prove that sales of [Texaco] petroleum products in [the area in question] constitute a relevant market."

Appellants contend that the value of the Texaco trademark establishes Texaco gasoline as a separate relevant submarket. They also contend that because Texaco stations can only sell Texaco fuel a product submarket exists for them. Accepting these arguments would lead to the conclusion that every manufacturer of a trademarked product has monopoly power over that product. No legal precept stands for this proposition, as the Supreme Court has emphatically held:

> [O]ne can theorize that we have monopolistic competition in every nonstandardized commodity with each manufacturer having power of the price and production of his own product. However, this power that, let us say, automobile or soft-drink manufacturers have over their trademarked products is not the power that makes an illegal monopoly. Illegal power must be appraised in terms of the competitive market for the product.

*United States v. E. I. duPont de Nemours & Co.*, 351 U.S. at 393, 76 S.Ct. at 1006 (footnote omitted). See also, *Columbia Metal*, 579 F.2d at 27 n.11.

If, on the other hand, the relevant market is all motor fuel sold in the area of Sweeney's stations, Texaco could not monopolize that market by driving Sweeney out of business. The retail price of Texaco gasoline sold by Sweeney's competitors and wholesale prices of Texaco fuel were determined to a large extent by market conditions of supply and demand involving all brand and non-brand gasoline. Competition from other refiners and independent dealers would severely limit Texaco's ability to succeed. See *Coleman*, 525 F.2d at 1348–49.

637 F.2d at 117–18.

■ As in *Sweeney*, the evidence in this case mandates the conclusion that the range of commodities "reasonably interchangeable by consumers for the same purposes" includes all brands of gasoline and that there are no product submarkets. In his affidavit in support of his application for a temporary restraining order, plaintiff averred that the gasoline he had purchased "on the open market is of the same quality as that supplied by the defendants." Blackwell Afft. ¶ 20, at 6, ¶ 13, at 4. In his affidavit, plaintiff also averred that he was in direct competition with at least five other brand name gas outlets within a ten block radius from his station. *Id.*, ¶ 11, at 3. Furthermore, at the onset of this litigation, plaintiff submitted an analysis of its gasoline purchased on the spot market in anticipation of "an appropriate concern the Court may have as to whether the plaintiff is in fact purchasing gasoline of an equivalent quality as that supplied by defendants to its dealers." Thus, plaintiff's affidavit, chemical analysis of its gasoline, and its admitted purchases from other spot market sources leads to a conclusion that the product is a fungible commodity. The Third Circuit reasoning in *Sweeney*, quoted *supra*, is ample authority for a grant of summary judgment as to the section 2 allegation of attempted monopolization.

Finally, it is clear that, assuming the relevant markets were pled and shown to exist, defendants lack both the requisite market power and intent to monopolize necessary to violate section 2. "The two essential elements of a § 2 attempt to monopo-

lize violation are a specific intent to monopolize the relevant market and sufficient market power to come dangerously close to success. *Coleman Motor Co. v. Chrysler Corp.*, 525 F.2d 1338, 1348 (3d Cir. 1975)." *Harold Friedman, Inc. v. Kroger Co.*, 581 F.2d 1068, 1079 (3d Cir. 1978) (footnote omitted). The enforcement of the gasoline clause by the defendants and relatively high price of their gasoline were the results of legitimate business decisions. Blackwell freely admitted that he was selling from trademarked pumps gasoline not purchased from sources approved by the holder of that trademark. Defendants' expressed great concern over this practice, as well they should have. In fact, they notified plaintiff that such practices created "a real potential for substantial injury to Power Test's trade name, trademark, good will, image and economic well being." Blackwell Afft., Exhibit G, at 2. It is also clear that defendants were aware of and alerted the plaintiff to the probable illegality of such actions under the Lanham Act, 15 U.S.C. § 1125, and the New Jersey Unfair Motor Fuels Practices Act, N.J.S.A. 56:6–2(g).

The high price of Power Test gasoline, in relation to the price on the spot market, was not the result of an attempt to monopolize or set prices. In fact, plaintiff explicitly recognized the business justification for the higher prices when he started this lawsuit. In his affidavit in support of his application for a temporary restraining order, Blackwell indicates that the reason for the higher prices had been explained to him by the defendants. "I was given to understand that PTNJ had a temporary problem in getting rid of its gasoline inventory which it had purchased at a high price. . . ." Blackwell Afft., ¶ 12, at 4. The particulars of this dilemma were explained by Power Test's executive vice-president in his affidavit in support of the defendants' motion for summary judgment. He averred that Power Test's major supplier had increased its price of motor fuel to Power Test by $.11 per gallon. Accordingly, Power Test was eventually forced to pass a portion of this increase on to its dealers. Safenowitz Afft., ¶¶ 2–5, at 1–2. It was this increase in

its purchase price that raised Power Test's gasoline price above that available on the spot market during the period plaintiff complains of, not Power Test's intent to attempt to monopolize.

The evidence that Power Test has no control over the price of gasoline also militates against a finding of sufficient market power necessary to monopolize. *See* Safenowitz Afft. Furthermore, although the defendants sell six percent of the retailed gasoline in the metropolitan area, defendants cannot restrict output. "Market power is usually stated to be the ability of a single seller to raise price and restrict output, for reduced output is the almost inevitable result of higher prices." *Fortner Enterprises, Inc. v. United States Steel Corp.*, 394 U.S. 495, 503, 89 S.Ct. 1252, 1258, 22 L.Ed.2d 495 (1969) (*Fortner I*). It is uncontroverted that all allocations of gasoline are regulated by the Department of Energy and are based on a 1972 base year's supply. Defendants must supply its dealers in accordance with the Department's regulations. Accordingly, plaintiff's allegation of an attempt to monopolize must be dismissed.

### CLAIM OF AN ILLEGAL "TIE–IN" IN VIOLATION OF SECTION 3 OF THE CLAYTON ACT, 15 U.S.C. § 14

In support of their motion for summary judgment with respect to the claimed violation of section 3 of the Clayton Act, 15 U.S.C. § 14, the defendants assert that the Clayton Act is not applicable to this action. Section 3 of the Clayton Act provides:

It shall be unlawful for any person engaged in commerce, in the course of such commerce, to lease or make a sale or contract for sale of goods, wares, merchandise, machinery, supplies, or other commodities, whether patented or unpatented, for use, consumption, or resale . . ., or fix a price charged therefor, or discount from, or rebate upon, such price, on the condition, agreement, or understanding that the lessee or purchaser thereof shall not use or deal in the goods, wares, merchandise, machinery, supplies,

or other commodities of a competitor or competitors of the lessor or seller, where the effect of such lease, sale, or contract for sale or such condition, agreement, or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce.

15 U.S.C. § 14.

Specifically, defendants contend that "[t]he plaintiff . . . is alleging an illegal tie between the leasing of service stations, clearly not a commodity within the purview of the Clayton Act, and the purchase of gasoline and other petroleum products." Defendants' Brief at 6. Plaintiff counters with the argument that

> [w]hile a cursory perusal of the complaint might mislead one to believe that sufficient facts were not pleaded to sustain a Section 3 claim, defendants' lease agreement which was annexed to plaintiff's complaint established a *prima facie* case of the tying of gasoline sales to the equipment loaned or leased by defendants to Power Test dealers.

Plaintiff's Brief at 21. Defendants respond with the assertion that the equipment is affixed to the real estate and, therefore, is made a part of the reality to which it adheres and partakes of all its incidents and properties. Thus, defendants contend that these assertions of plaintiff do not "transform" the lease of a gas station into a lease of equipment. Defendants' Reply Brief at 4.

■ It is well established that a tie-in arrangement can be regarded as illegal under section 3 of the Clayton Act and section 1 of the Sherman Act. *International Salt Co. v. United States*, 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20 (1947). If the tying or tied products are goods, wares, or other commodities, the case falls within the ambit of the Clayton Act and the plaintiff need only show that a "substantial volume of com-

merce in the 'tied' product is restrained." *Times-Picayune Publishing Co. v. United States*, 345 U.S. 594, 608–609, 73 S.Ct. 872, 880–881, 97 L.Ed. 1277 (1952). It is important to emphasize that the Clayton Act only applies to sales or leases of "goods, wares, merchandise, machinery, supplies, or other commodities." 15 U.S.C. § 14. "If the tie does not involve a commodity but concerns land, services or credit, which do not fit the Clayton Act's language, it is governed by the Sherman Act and the plaintiff is required to bear the additional burden of proving that the defendant's economic power with respect to the tying product is sufficient to produce an appreciable restraint." *N. W. Controls, Inc. v. Outboard Marine Corp.*, 333 F.Supp. 493, 500 (D.Del.1971).

■ In the instant action, the specific allegations of the plaintiff are that the "[d]efendants have tied to *a lease agreement* a provision requiring plaintiff . . . to purchase all their gasoline requirements from defendants." Complaint, ¶ 9(b), at 5 (emphasis added). The plaintiff also alleged that "[d]efendants have used their control over *land* in the form of gasoline sales outlets to coerce plaintiff . . . to purchase gasoline and other gasoline products only from defendants at fixed artificial prices higher than that in the open market." *Id.*, ¶ 9(e), at 5 (emphasis added). The lease agreement emphasized above is a real estate lease, not a lease of equipment. Even assuming that equipment was also leased, such equipment is affixed to the real property for a business purpose and thus partakes of the incidents of real property. *Handler v. Horns*, 2 N.J. 18, 23–24, 65 A.2d 523 (1949); *Fahmie v. Nyman*, 70 N.J.Super. 313, 319–320 (App.Div.1961). Accordingly, the cause of action based on an alleged violation of the Clayton Act must be dismissed.[3]

---

**3.** Further support for this holding is found in *FTC v. Sinclair Refining Co.*, 261 U.S. 463, 43 S.Ct. 450, 67 L.Ed. 746 (1922). In *Sinclair*, the Court held that the practice, upon the part of the defendant, of leasing underground tanks with pumps to retail dealers at nominal rentals and upon the condition that the equipment

shall be used only with gasoline supplied by the lessor, was not violative of the Clayton Act. *Id.* at 473, 43 S.Ct. at 453. Furthermore, the Court stated "[t]he lessee is free to buy wherever he chooses; he may freely accept and use as many pumps as he wishes and may discontinue any or all of them. He may carry on

## CLAIM UNDER SECTION 1 OF THE SHERMAN ACT, 15 U.S.C., § 1

In support of their motion for summary judgment as to this final claim, defendants make numerous arguments. First, they assert that the threshold requirement of a "conspiracy" cannot be satisfied since the defendants are all part of one corporate entity, under the same managerial control, not in competition with each other. Defendants submit the affidavit of Power Test Corp.'s president to establish these facts. Second, the defendants assert that since the complaint in this action failed to allege with particularity the circumstances of the allegedly unlawful combination and/or conspiracy it must be dismissed. Third, the defendants argue that their common action, if there was such, was not illegal since they acted for legitimate business purposes, *i.e.*, fostering competition by maintaining both product and trademark integrity. Fourth, the defendants contend that they are without sufficient market strength to restrict competition significantly so as to restrain trade or fix prices.

Section 1 of the Sherman Act, 15 U.S.C., § 1, provides in pertinent part: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, ... is declared to be illegal." The standard section 1 analysis requires several elements be established in order to maintain a section 1 action.

In order to sustain a cause of action under § 1 of the Sherman Act, the plaintiff must prove: (1) that the defendants contracted, combined, or conspired among each other; (2) that the combination or conspiracy produced adverse, anticompetitive effects within relevant product and geographic markets; (3) that the objects of and the conduct pursuant to that contract or conspiracy were illegal; and (4) that the plaintiff was injured as a proximate result of that conspiracy.

*Martin B. Glauser Dodge Co. v. Chrysler Corp.*, 570 F.2d 72, 81 (3d Cir. 1977), *cert. denied*, 436 U.S. 913, 98 S.Ct. 2253, 56 L.Ed.2d 413 (1978). The courts, however, have also established an additional method of inquiry when addressing allegations that the section 1 violation involves an alleged illegal tying agreement. In *Bogus v. American Speech & Hearing Ass'n*, 582 F.2d 277 (3d Cir. 1978), and *Bogosian v. Gulf Oil Corp.*, 561 F.2d 434 (3d Cir. 1977), *cert. denied*, 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978), the Third Circuit explained:

The Supreme Court in *Northern Pacific Railway Co. v. United States*, 356 U.S. 1, [78 S.Ct. 514, 2 L.Ed.2d 545] ... (1958), prescribed the elements of a *per se* unreasonable tie-in which violates the Sherman Act. First, the tie itself must be established by reference to an agreement conditioning the sale of the tied product to separate purchase of the tying product.... Second, a "not insubstantial" amount of commerce must be affected.... Third, the seller must have "sufficient economic power with respect to the tying product to appreciably restrain free competition in the market for the tied product." ... These three elements of *per se* illegal tie-ins are well established in subsequent Supreme Court decisions, as well as within this circuit.... Even if plaintiff fails to meet the standards of *per se* illegality, she or he may prevail on the merits by providing [*sic*] that a tie-in unreasonably restrains competition in violation of the more generous standards of the Sherman Act.

*Bogus v. American Speech & Hearing Ass'n*, 582 F.2d at 286–87 (citations omitted). It is with these general standards in mind that the court now addresses the defendants' motion on this claim.

■ Defendants' first argument in support of their motion must be rejected. As previously mentioned, defendants allege that there cannot exist the requisite con-

---

business as his judgment dictates and his means permit, save only that *he cannot use the lessor's equipment for dispensing another's brand."* *Id.* at 474, 43 S.Ct. at 453 (emphasis added).

spiracy where, as here, the defendants are all part of one corporate entity and do not compete with one another nor hold themselves out as competitors. This position has been rejected by the Supreme Court and the Third Circuit. *Perma Life Mufflers, Inc. v. International Parts Corp.*, 392 U.S. 134, 141–42, 88 S.Ct. 1981, 1985–86, 20 L.Ed.2d 982 (1968); *Kiefer-Steward Co. v. Joseph E. Seagram & Sons*, 340 U.S. 211, 215, 71 S.Ct. 259, 261, 95 L.Ed.2d 219 (1951); *Columbia Metal Culvert Co. v. Kaiser Aluminum & Chem. Corp.*, 579 F.2d 20, 33 & n.49 (3d Cir. 1978); *Cromar Co. v. Nuclear Materials & Equip. Corp.*, 543 F.2d 501, 511 (3d Cir. 1976); *Coleman Motor Co. v. Chrysler Corp.*, 525 F.2d 1338, 1345 (3d Cir. 1975).

Furthermore, the second point pressed by the defendants is not persuasive. It is well settled that a complaint need only give notice to the opposing party by a short plain statement of his or her claim, Fed.R.Civ.P. 8(a). It is not necessary to plead evidence. *Bogosian v. Gulf Oil Corp.*, 561 F.2d at 444–47; *George C. Frey Ready-Mixed Concrete, Inc. v. Pine Hill Concrete Mix Corp.*, 554 F.2d 551, 553–54 (2d Cir. 1977). I also note that the proper procedure to have been employed by the defendant would have been a motion for a more definite statement pursuant to Fed.R.Civ.P. 12(e). Accordingly, alleged defects of this nature, *i.e.*, vagueness or ambiguity, are cured by motions for more definite statements, not motions for summary judgment.

Although defendants' first two arguments are without merit, I find the remaining assertions dispositive of this aspect of the motion. It is well established that to prove a *per se* illegal tie-in the plaintiff must establish three things.

First, he must establish that the conduct in question was a tie-in: "an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product." *Northern Pacific Ry. v. United States*, supra, 356 U.S. at 5 [78 S.Ct. at 518] ... Second, he must establish that the seller "has sufficient economic power with respect to the tying product to appreciably

restrain free competition in the market for the tied product." *Ibid.* at 6 [78 S.Ct. at 518]. And third, he must establish that "a 'not insubstantial' amount of interstate commerce is affected." *Ibid.*

*Ungar v. Dunkin' Donuts of America, Inc.*, 531 F.2d 1211, 1223–24 (3d Cir. 1976). The first element of the alleged violation has been conceded by the defendants, *i.e.*, the existence of a tie-in. It is the second element upon which the dispute focuses.

In *Times-Picayune Publishing Co. v. United States*, 345 U.S. 594, 73 S.Ct. 872, 97 L.Ed. 1277 (1953), the Supreme Court discussed this element in great detail. The Court explained:

> From the "tying" cases a perceptible pattern of illegality emerges: When the seller enjoys a monopolistic position in the market for the "tying" product, *or* if a substantial volume of commerce in the "tied" product is restrained, a tying arrangement violates the narrower standards expressed in § 3 of the Clayton Act because from either factor the requisite potential lessening of competition is inferred. And because for even a lawful monopolist it is "unreasonable, *per se*, to foreclose competitors from any substantial market," a tying arrangement is banned by § 1 of the Sherman Act whenever *both* conditions are met.

345 U.S. at 608–09, 73 S.Ct. at 880–81 (emphasis in original) (footnote omitted). The Court further highlighted the importance of market domination when it stated:

> But the essence of illegality in tying agreements is the wielding of monopolistic leverage; a seller exploits his dominant position in one market to expand his empire into the next. Solely for testing the strength of that lever, the whole and not part of a relevant market must be assigned controlling weight.

*Id.* at 611, 73 S.Ct. at 881.

The importance of dominance in the tying market was again discussed in *Northern Pacific Ry. v. United States*, 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958). In that case it had been alleged that the Railway's

control over the land market had satisfied this second element. The Court wrote:

[Tying agreements] . . . are unreasonable in and of themselves whenever a party has sufficient economic power with respect to the tying product to appreciably restrain free competition in the market for the tied product and a "not insubstantial" amount of interstate commerce is affected. . . . Of course where the seller has no control or dominance over the tying product so that it does not represent an effectual weapon to pressure buyers into taking the tied item any restraint of trade attributable to such tying arrangements would obviously be insignificant at most.

*Id.* at 6–7, 78 S.Ct. at 518–519 (citations omitted). In that case, the Court found that the Railway "possessed substantial economic power by virtue of its extensive landholdings", *i.e.*, millions of acres of land granted it by Congress, to exert levelage on its lessees and purchasers so as to obtain a preference over its competitors. *Id.* at 7, 78 S.Ct. at 519.

The issue of economic power was addressed again in *United States Steel Corp. v. Fortner Enterprises, Inc.*, 429 U.S. 610, 97 S.Ct. 861, 51 L.Ed.2d 80 (1977) (*Fortner II*). In *Fortner II*, the Court examined market strength in terms of the uniqueness of the tying product.

[T]he unique character of the tying product has provided critical support for the finding of illegality in prior cases. Thus, the statutory grant of a patent monopoly . . ., copyright monopolies . . ., and . . . extensive land holdings . . . represented tying products that the Court regarded as sufficiently unique to give rise to a presumption of economic power.

As the Court plainly stated in its prior opinion in this case, these decisions do not require that the defendant have a monopoly or even a dominant position throughout the market for a tying product. . . . They do, however, focus attention on the question whether the seller has the power, within the market for the tying product, to raise prices or to require purchas-

ers to accept burdensome terms that could not be exacted in a completely competitive market. In short, the question is whether the seller has some advantage not shared by his competitors in the market for the tying product.

Without any such advantage differentiating his product from that of his competitors, the seller's product does not have the kind of uniqueness considered relevant in prior tying-clause cases.

*Id.* at 619–21, 97 S.Ct. at 867–68 (citations and footnotes omitted).

The Third Circuit in *Bogosian v. Gulf Oil Corp., supra*, has also set some guidelines for determining market strength. In *Bogosian*, the Court specifically considered this second element in terms of an alleged tying arrangement involving gas station leases and wholesale gasoline sale. The Third Circuit indicated:

We agree with plaintiffs that market power can be demonstrated without examining whether each gas station is strategically located. Plaintiffs could show, for example, that the defendants controlled a majority of existing service stations and that because of zoning restrictions and high capital costs make development of new stations difficult, the defendants have sufficient market dominance over existing stations to impose a tie-in.

561 F.2d at 454. I note, however, that Judge Aldisert, in a vigorous dissent, most aptly highlighted serious problems with this line of reasoning. One problem emphasized by Judge Aldisert was

that plaintiffs could show that defendants control a majority of existing stations. This follows almost tautologically from the fact that plaintiffs have named as defendants most of the major companies in a concentrated industry. This element of proof can be satisfied in any reasonably concentrated industry simply by naming enough defendants.

*Id.* at 461 (Aldisert, J., dissenting).

An application of the legal standards set forth above to the present matter clearly indicates that the allegation of a

section 1 violation must be dismissed. The defendants do not possess sufficient economic power with respect to the tying product to appreciably restrain free competition in the market for the tied product. Plaintiff asserts that

> [a]n examination of the Form 10–K Annual Report filed by defendant Power Test Corporation for the fiscal year ended January 31, 1980 reveals that the company is the largest independent (operating 455 gasoline outlets) and sixth largest gasoline marketing company in terms of share of market in the New York Metropolitan areas.

Plaintiff's Brief at 15. This argument, however, is misplaced. The focus must be on sufficiency of economic power in the tying product market, *i.e.*, ownership of real estate used as retail gasoline sales outlets, not the defendants' share of the retail sales market. *See Times-Picayune Publishing Co. v. United States*, 345 U.S. at 610, 73 S.Ct. at 881. The defendant's Form 10–K reveals that "[o]n January 31, 1980, the Company owned 173 gasoline stations and leased 184 additional gasoline stations. Approximately 90% of such leases expire subsequent to 1980. The Company in turn leased or subleased 351 of such gasoline stations to others." Blackwell Afft. Exhibit A, at 4. From this relatively small number of outlets a mere six percent of the retail sales market in the Greater New York Metropolitan Area is controlled by defendants. Answers to Interrogatory 30. In addition to this obvious lack of market dominance or monopoly position, the tying product lacks the uniqueness recognized as "critical" by the Supreme Court in *Fortner II*. Furthermore, defendants do not possess "some advantage not shared by . . . competitors in the market for the tying product. *Fortner II*, 429 U.S. at 621, 97 S.Ct. at 868. The validity of these statements are recognized by the plaintiff, albeit unwittingly, when in his affidavit in support of the temporary restraining order he averred:

> The premises at 201 Elmora Avenue is located adjacent to two other gasoline sales outlets. One is an Exxon franchise located on Elmora Avenue and a Chevron

outlet also located on Elmora Avenue. Within a radius of ten blocks of 201 Elmora Avenue there are at least five other gas outlets under the brand name of major oil companies such as Getty, Shell and Mobil.

Blackwell Afft., ¶ 11, at 3. Thus, it is clear that the defendants lack the requisite market position essential for a violation of section 1 of the Sherman Act due to a *per se* illegal tying arrangement.

What has been stated in the *per se* analysis above goes far in disposing of the argument that the "tie-in unreasonably restrains competition in violation of the more generous standards of the Sherman Act." *Bogus v. American Speech & Hearing Ass'n*, 582 F.2d at 287. In addition to the apparent lack of market strength, the restraints imposed upon the plaintiff by the defendants are justified by legitimate business considerations. *Times-Picayune Publishing Co. v. United States*, 345 U.S. at 622, 73 S.Ct. at 887. The evidence before the court reveals that the impetus for the enforcement of the termination provisions in the lease and franchise agreement was the protection of product and trademark integrity. Blackwell Afft., Exhibit G, at 2. This rationale is compelling in light of the probable violation by the plaintiff of the Lanham Act, 15 U.S.C. § 1125, and the New Jersey Unfair Motor Fuels Practices Act, N.J.S.A. 56:6–2. Thus, it cannot be said that the enforcement of the lease and franchise agreements unreasonably restrained trade.

On the basis of the foregoing opinion, the court will grant the defendants' motion for summary judgment dismissing the complaint. This determination moots the necessity of addressing plaintiff's motion for class certification. The defendants will submit an appropriate form of order with consent, if possible, within ten days.