**POWER TEST PETROLEUM DISTRIBUTORS, INC.,**
Plaintiff-Appellee,

v.

**CALCU GAS, INC. and Yonkers Overpass Equities Corp.,**
Defendants,

**Yonkers Overpass Equities Corp.,**
Defendant-Appellant.

No. 304, Docket 84–7423.

United States Court of Appeals,
Second Circuit.

Argued Oct. 17, 1984.

Decided Jan. 29, 1985.

Charles T. Bistany, White Plains, N.Y., for defendant-appellant.

Robert G. Del Gadio, Garden City, N.Y. (John P. Hannigan, Steven M. Jampol, Garden City, of counsel), for plaintiff-appellee.

Before NEWMAN, CARDAMONE and DAVIS,[*] Circuit Judges.

DAVIS, Circuit Judge:

The main question here is whether a gasoline franchisor which purchases a product from a manufacturer and then affixes its own trademark may require that the franchisee market only those products bearing the franchisor's trademark. We hold that, under the principles of trademark law, such an arrangement does not constitute an antitrust violation in this case, and therefore appellant has no valid defense to appellee's claim of trademark infringement. The district court did not abuse its discretion in issuing the preliminary injunction, and we affirm.

I

Appellee Power Test Petroleum Distributors, Inc. (Power Test) is in the business of purchasing and subsequently distributing gasoline and related petroleum products. It also leases and franchises gasoline stations in the northeast United States to carefully selected dealers who operate under the trademark and service mark, "Power Test."[1] The primary function of these stations is the sale of gasoline and motor oil to the consuming public. Power Test is not a refiner of gasoline but (in much the same way as a "jobber") purchases gasoline either from a third party (e.g., a major oil refiner) or on the "spotmarket." It then tests the gasoline for octane, viscosity and impurities before distributing the gasoline to its franchisees under the trademark "Power Test." Appellant Yonkers Overpass Equities Corp. (Yonkers) is one of these franchised gasoline stations.

Yonkers and Power Test entered into a "Retail Dealer Contract" (Contract) which requires Yonkers as franchisee to purchase all of its gasoline from Power Test. In addition, under the terms of the Contract, Yonkers is prohibited from both storing or selling gasoline received from any source other than Power Test, and covering or removing any of the Power Test signs or logos which appear on the premises.[2] The

[*] Honorable Oscar H. Davis, of the United States Court of Appeals for the Federal Circuit, sitting by designation.

[1.] Power Test's registered trademark (917,523 issued Aug. 3, 1971) for "Petroleum hydrocarbon fuels, lubricating greases and lubricating oils," and registered service mark (933,404 issued May 2, 1972) for "Automotive maintenance, repair and fueling station services," have become incontestable under 15 U.S.C. § 1065.

[2.] The most pertinent paragraphs of the Retail Dealer Contract recite:

1. The Company shall sell and the Dealer shall purchase, during the entire term of this agreement and any extensions and renewals hereof, the gasoline, motor oil and other products marketed and used by the Company, as determined by the Company.

14. Dealer shall use the Company's trademarks, trade name, brand names, labels, insignia, symbol or imprints to identify and advertise the Company's products and shall not use such trademarks, trade names, brand names, labels, insignia, symbol or imprints for any other purpose.

15. Dealer shall not mix any other products with the Company's products or adulterate them in any way and shall not use the Company's trademarks, trade names, brand names, labels, insignia, symbol or imprints in connection with the storage, handling, dispensing or

parties also simultaneously executed and entered into a "Retail Gasoline Station Lease Agreement" (Agreement) in which Power Test leased Yonkers the gas station in question.[3] Yonkers paid no franchise fee. As a dealer, Yonkers is an independent businessman subject only to the terms of the Contract and Agreement.

This dispute arose when an investigation conducted by Power Test disclosed that Yonkers was improperly selling a non-Power Test brand of gasoline supplied to it by Calcu Gas, Inc. (Calcu).[4] Power Test commenced this action for trademark and service mark infringement, wrongful use in commerce of false designations of origin, false descriptions and false representations—all in violation of the Lanham Trademark Act; and for unfair competition, trademark dilution and false advertising—under New York law. Power Test sought an accounting, punitive damages and interlocutory relief enjoining Yonkers from continued trademark infringement and violation of the Agreement and Contract.

After a hearing, the district court issued a temporary restraining order (TRO) prohibiting Yonkers from both purchasing gasoline from suppliers other than Power Test and covering any Power Test signs or logos on the premises. Later, Power Test moved for an order to show cause why Yonkers should not be held in contempt of court for violating the TRO; Power Test also requested damages, attorney's fees, costs and a preliminary injunction.

The court below found that Yonkers received a delivery of non-Power Test gasoline subsequent to the date of the TRO. In addition, the Power Test trademark on the signs and pumps had been covered up and motorists were told that they were purchasing non-Power Test gasoline. The district court held these acts to be a willful and intentional attempt to circumvent the terms of the TRO, and therefore constituted contempt. A fine commensurate with the amount of proven damages was then assessed against Yonkers. In addition, the court awarded attorney's fees and costs incurred in bringing the contempt motion.[5]

Based on a Yonkers officer's admission that Yonkers did in fact sell non-Power Test gasoline, which he claimed was necessary so that Yonkers could stay in business, the district court issued a preliminary injunction. Appellant contended unsuccessfully that its purchase of gasoline is tied to the Power Test trademark by the Agreement and Contract in violation of the antitrust laws, thus precluding the issuance of a preliminary injunction. Being forced to purchase Power Test gasoline as a condition to licensing the Power Test trademark, argues Yonkers, produces economic harm to competition in the retail gas market in contravention of the antitrust

sale of any adulterated, mixed or substituted products.

16. Dealer shall not sell gasoline and petroleum products received from any source, other than the Company, under the trademark, service mark, trade name, brand name, label, insignia, symbol or imprint of the Company or used by the Company in its business.

17. Dealer shall sell only the Company's gasoline and other petroleum products from the Station and shall not sell gasoline or petroleum products supplied by anyone else.

35. Dealer shall keep legible and visible all brand names, trademarks and signs of the Company.

36. Dealer shall use the Equipment solely for the Company's products.

3. The most pertinent paragraphs of the Lease Agreement state:

22. Tenant shall fully and completely comply with the Retail Dealer Contract entered into by Tenant as a dealer. Any breach or termination of the Retail Dealer Contract shall be a breach or termination of this Agreement.

26(c). ... If Tenant causes or suffers any grade of Power Test brand gasoline to be mixed with another grade or brand of Power Test brand gasoline with Power Test's gasoline in a storage tank connected to a dispensing pump on the premises, or if Tenant sells or holds out for sale as a Power Test brand gasoline that which is not a Power Test brand gasoline (it shall constitute a material breach of this contract).

4. Co-defendant Calcu agreed to the entry of a permanent injunction against it, and therefore is not a party to this appeal.

5. No appeal has been taken from these decisions.

laws. Judge Mishler held, however, that the trademark and gasoline are not separate items because Power Test is a source mark "identical to the product attached to the name." Therefore, because no separate products exist, there could not be a tying arrangement. In addition, the court found that Yonkers failed to allege or establish the additional requirements for an antitrust tying arrangement. As we have noted (note 5, *supra*), Yonkers' appeal is directed solely to the asserted antitrust tying arrangement and the propriety of the preliminary injunction.

In this court, Yonkers continues to claim that a tying arrangement exists. It argues that the Power Test trademark does not identify the "source" of the gasoline products, but merely warrants their "quality." Further, Yonkers contends that the source is actually the manufacturer or refiner from which Power Test buys its gasoline. Because the trademark is said to be a "quality" trademark separable from the gasoline products, and the Contract requires that the products be purchased from the trademark owner, an illegal tying arrangement is claimed to exist. Moreover, because gasoline is gasoline, and Power Test's product is not unique, Yonkers denies that any justification for such a tie-in exists in this case. Such alleged monopolistic practices are said to constitute a complete defense to Power Test's trademark infringement claims, and a preliminary injunction is improper. Power Test, on the other hand, argues that the Power Test trademark is not a separate and distinct product from Power Test gasoline, and, even if there is a tie-in, there has been no showing of the additional requirements for an antitrust violation.

## II

■ The sole issue is whether the district court properly granted appellee's motion for a preliminary injunction. The grant of interlocutory injunctive relief is within the sound discretion of the district court judge, and this court will not disturb an injunction unless the appellant can show an abuse of discretion. *Coca-Cola Co. v. Tropicana Products, Inc.,* 690 F.2d 312 (2d Cir.1982); *Societe Comptoire de L'indus. Etc. v. Alexander's Dept. Stores, Inc.,* 299 F.2d 33 (2d Cir.1962). Such abuse of discretion may exist if the district court's findings of fact are shown to be clearly erroneous or if the district court made an error of law. *See Coca-Cola, supra,* 690 F.2d at 315. The party requesting preliminary relief must show (1) irreparable harm, and (2) either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits to make them fair grounds for litigation and a balance of hardships tipping decidedly in favor of the movant. *Arrow United Industries, Inc. v. Hugh Richards, Inc.,* 678 F.2d 410, 413–14 (2d Cir.1982). We hold that the district court properly found both elements ((1) and (2)(a)) present in this case.

■ The first element, irreparable injury, exists in a trademark case when the party seeking the injunction shows that it will lose control over the reputation of its trademark pending trial. *See* 2 McCarthy, *Trademarks and Unfair Competition,* § 30.15 (2d ed. 1984). Reputation is not calculable nor precisely compensable. In this instance it rests on Power Test's activities in distributing the gasoline, and may very well diminish as a result of confusion caused by Yonkers' selling non-Power Test gasoline from a Power Test franchised location.[6] Accordingly, the district court did not err in concluding that irreparable injury flowed from the trademark infringement.

■ Yonkers admits that it sold non-Power Test gasoline. Thus, likelihood of success on the merits is also present. Yonkers asserts, however, the defense of an antitrust tie-in. An antitrust tie-in

**6.** Recently, in *Wisser v. Mobil Oil Co.,* 730 F.2d 54, 60 (2d Cir.1984), this court stated that the misbranding of gasoline by a franchisee ("passing off non-Mobil gasoline under the Mobil trademark") was "a serious violation of [the franchisor's] contract and property rights, and it was perpetrating a fraud on the public."

claim, if proven, will constitute a defense to trademark infringement. *See Carl Zeiss Stiftung v. V.E.B. Carl Zeiss, Jena,* 293 F.Supp. 892 (S.D.N.Y.1968), *modified on other grounds,* 433 F.2d 686 (2d Cir.1970), *cert. denied,* 403 U.S. 905, 91 S.Ct. 2205, 29 L.Ed.2d 680 (1971). A "tie-in" includes an agreement by a party to sell or lease one product only on the condition that the buyer also purchases or leases a different product from the same seller. It is the forced purchase of a second distinct "tied" product with the desired purchase of a dominant "tying" product that reduces competition in the "tied" market. *See Times-Picayune Publishing Co. v. United States,* 345 U.S. 594, 73 S.Ct. 872, 97 L.Ed. 1277 (1953). Five elements of a tying arrangement must exist in order for there to be an antitrust violation: (1) two distinct products; (2) evidence of coercion; (3) sufficient economic power in the tying product market; (4) anticompetitive effect in the tied market; and (5) involvement of a not insubstantial amount of interstate commerce in the tied market. *Yentsch v. Texaco, Inc.,* 630 F.2d 46, 56–57 (2d Cir.1980). Even if all these elements have been proven, there may still exist an adequate justification for the tie-in. *Standard Oil Co. v. United States,* 337 U.S. 293, 69 S.Ct. 1051, 93 L.Ed. 1371, *reh. denied,* 338 U.S. 808 (1949).

## III

■ In this case, the dispositive question—the primary one to consider—is whether two separate products exist. Appellant asserts that the trademark (the "tying" product) and gasoline (the "tied" product) are two separate products capable of being tied together because "Power Test" is said to be a "quality" trademark, not a "source" trademark. The district court properly stated that a trademark could in proper circumstances constitute a separate tying product. *Susser v. Carvel Corp.,* 332 F.2d 505 (2d Cir.1964), *cert. dismissed,* 381 U.S. 125, 85 S.Ct. 1364, 14 L.Ed.2d 284

(1965). However, in reaching its conclusion that separate products do not exist here, the district court relied upon the guidelines it believed had been set forth in *Hamro v. Shell Oil Co.,* 674 F.2d 784 (9th Cir.1982). The district court thought that the Ninth Circuit in *Hamro* and other cases had suggested that there are two different types of marks: (1) trademarks that identify the source of a product; and (2) trademarks that warrant the quality of a product; in the Ninth Circuit's presumed view, only the latter could improperly be tied with a product.[7] In *Hamro,* Shell Oil was the manufacturer of the gasoline and the Shell trademark identified the source of the gasoline; the trademark and the gasoline were held to be one and the same for antitrust purposes. The district court below reached the same conclusion. Appellant urged in the district court, and argues before us, that the supposed *Hamro* test, although the *Hamro* facts are distinguishable, still applies. The claim is that Power Test is not the manufacturer of gasoline but merely buys gas and warrants its quality to its dealers. Under that argument, "Power Test" is said to be a quality mark capable of being tied, not a source mark like Shell Oil's.

■ We need not decide whether a distinction between "source" and "quality" marks exists or is ever helpful or correct in the antitrust context because we are satisfied that, regardless of that distinction, the district court was quite correct in this case that there were no separate or tied products. Our position, invoking basic trademark principles, is simply that here the gasoline and the Power Test marks are inseparable, inextricably interrelated, and not separate entities.

■ A. The "metes and bounds" of a trademark are defined by the perceptions that exist in the minds of the relevant buying public. It is this customer perception which decides what property rights the

---

**7.** We do no more than paraphrase the district court's (and appellant's) view of the Ninth Circuit position, without in any way attempting to interpret for ourselves the scope or reach of those decisions.

trademark owner has. These property rights are often infringed; and what may be thereby impaired is both the consumer's right to be free from confusion and the trademark owner's right to a non-confused consumer and to control of his product's reputation. *See* 1 McCarthy, *Trademarks and Unfair Competition*, § 2.6 (2d ed. 1984). This court many years ago stated:

> [T]rademark is not a property in the ordinary sense but only a word or symbol indicating the origin of a commercial product. The owner of the mark acquires the right to prevent the goods to which the mark is applied from being confused with those of others and to prevent his own trade from being diverted to competitors through their use of misleading marks.

*Industrial Rayon Corp. v. Dutchess Underwear Corp.*, 92 F.2d 33, 35 (2d Cir.1937), *cert. denied*, 303 U.S. 640, 58 S.Ct. 610, 82 L.Ed. 1100 (1938).

Another way of putting it is that a trademark epitomizes the goodwill of a business. This creation and perpetuation of goodwill depends on customer recognition. The nature of goodwill is dictated by the consumer's desire to do business with the same seller. The buyer expects the same experience with each purchase—this is the *reason d'etre* for the sale. We need not know the specific reason behind the goodwill, only that it exists. Presumably, this is why independent businessmen such as Yonkers seek to obtain a license from a trademark owner and "pay for the privilege that gives a reasonable expectancy of preference." McCarthy, *supra* at § 2.8.

A licensor, however, must still maintain some degree of control over his trademarked product, or else his trademark might be considered to have been abandoned. *See Stock Pot Restaurant, Inc. v. Stockpot, Inc.*, 737 F.2d 1576, 1579–80 (Fed.Cir.1984). The danger of the trademark owner's failing to take on this affirm-

ative duty is that products with the same trademark will have diverse characteristics. *See Dawn Donut Co. v. Hart's Food Stores, Inc.*, 267 F.2d 358 (2d Cir.1959). "If a trademark owner allows licensees to depart from its quality [or other] standards, the public will be misled, and the trademark will cease to have utility as an informational device." *Kentucky Fried Chicken Corp. v. Diversified Packaging Corp.*, 549 F.2d 368, 380 (5th Cir.1977).[8]

B. The facts found below show that, under these trademark principles stressing the perception of the consuming public, the trademark and the product in this case are inseparable. The only product ultimately sold, the gasoline, comes from appellee Power Test, and, as the district court found, "[t]his is precisely the product the consumer attaches to the trademark Power Test." That trademark is thus inseparably connected with the gasoline. It is not "necessary that the purchasers actually know the name of the manufacturer or the goods they purchase." *Feathercombs, Inc. v. Solo Products Corp.*, 306 F.2d 251, 255 (2d Cir.), *cert. denied*, 371 U.S. 910, 83 S.Ct. 253, 9 L.Ed.2d 170 (1962). The goodwill reflected by the trademark attaches to Power Test's gasoline products themselves.

In *Redd v. Shell Oil*, 524 F.2d 1054 (10th Cir.), *cert. denied*, 425 U.S. 912, 96 S.Ct. 1508, 47 L.Ed.2d 762 (1975), the Tenth Circuit reasoned that the Shell trademark represented Shell gasoline made by *or* for Shell. The Shell gasoline was the most important product sold. Shell did not license its trademark separately from its gasoline. Similarly, Power Test has a registered trademark for its "Petroleum hydrocarbon fuels," and does not license that trademark separately. The trademark is not distinct from the gasoline sold. Our inquiry lies here in what end-product Power Test *sells*, not where or from whom it

---

**8.** Franchising (which is present in this case) is often a sophisticated form of trademark licensing. Although a trademark or trade name is usually included in a franchise system, a franchise system can go well beyond being merely a

trademark license. *Principe v. McDonald's Corp.*, 631 F.2d 303, 309 (4th Cir.1980), *cert. denied*, 451 U.S. 970, 101 S.Ct. 2047, 68 L.Ed.2d 349 (1981).

buys, because this is what the consumer perception is based upon.

In *Krehl v. Baskin-Robbins Ice Cream Co.*, 664 F.2d 1348 (9th Cir.1982), the Ninth Circuit held that the Baskin-Robbins trademark lacked sufficient independent existence apart from the ice cream. That plaintiff argued that the ice cream was not manufactured by Baskin-Robbins, and therefore it was a separate "tied" product. The court responded that the trademark served to identify the ice cream which was made in accordance with Baskin-Robbins' specifications, and therefore the actual manufacturer of the ice cream was unimportant. 664 F.2d at 1353, fn. 14. By analogy, Power Test (1) checks for viscosity, octane level and general quality of the gasoline before distribution, and (2) sells under its own logos, trademark, and advertising.

Appellant Yonkers still insists that this case differs from other cases finding absence of separation between the mark and the product because the owner of the mark, Power Test, is not a manufacturer of the gasoline but merely a purchaser of that item. Both *Redd* and *Krehl, supra*, show that this manufacturer-purchaser distinction is not controlling. Moreover, the Lanham Act itself expressly recognizes both manufacturers and sellers as trademark owners. The Act defines a trademark as a symbol used by a "manufacturer or *merchant* to identify his goods and distinguish them from those manufactured *or* sold by others." 15 U.S.C. § 1127 (emphasis added). This says that a trademark owner may affix his trademark to a product manufactured for him, or that the product need not be one he manufactures. What is essential is that the product pass through his hands and that he give to the product the benefit of his reputation, name, business

style, or methods. *See Victor Tool & Machine Corp. v. Sun Control Awnings, Inc.*, 299 F.Supp. 868, 874 (E.D.Mich.1968), *aff'd,* 411 F.2d 792 (6th Cir.1969). In this particular case, for example, Power Test applies (among other things) its own standards (testing for octane, viscosity and impurities) before it distributes the gasoline for sale under its mark. As the district court properly found below: "[a]lthough Power Test does not manufacture or refine its gasoline, it deals with it in such a way as to guarantee the contents and standards of the product it sells." To the purchaser, Power Test gasoline is simply not fungible with any and all other gasolines.[9]

The upshot is that this is not a case in which the trademark and the product are separate in the consumer's eyes—and therefore there is no possibility of a tying arrangement which could violate antitrust legislation (and thereby constitute a defense to the claim of trademark infringement).

## IV

■ The district court also held that Yonkers "has failed to allege, much less establish, the additional requirements for a tying arrangement claim, *i.e.*, that the seller has sufficient power in the tying product to coerce the buyer into purchasing the tied product and that the tying arrangement has anti-competitive effects in the market for the tied product." Having offered no evidence, Yonkers now cites *Blackwell v. Power Test Corp.*, 540 F.Supp. 802 (D.N.J. 1981), *aff'd without opinion,* 688 F.2d 818 (3rd Cir.1982), as support for its argument that "it has already been determined that [Power Test] is the largest independent gasoline marketing company in the New York metropolitan area." This citation is

---

9. We mention quality-testing solely because that element happened to be proved in this case. The same principle applies to any other factor bearing on the consumer's perception of the significance of the common source of the product in the case of the trademark, *e.g.*, price, convenience, availability. Because Power Test alone has the right to place its trademark on the gasoline it deems appropriate does not mean

that Yonkers, which does not control that mark, can independently decide that other gasoline is just the same as Power Test's. The essence of the trademark is that the owner controls its own product. *See Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.*, 478 F.Supp. 243 (E.D.Pa.1979), *aff'd,* 637 F.2d 105 (3d Cir.1980), *cert. denied,* 451 U.S. 911, 101 S.Ct. 1981, 68 L.Ed.2d 300 (1981).

taken totally out of context. In that portion of its *Blackwell* decision, the district court was merely quoting an assertion in Blackwell's brief that cited the Form 10-K Annual Report filed by Power Test. The court responded to Blackwell's argument by stating that "[t]he focus must be on sufficiency of economic power in the tying product market, *i.e.*, ownership of real estate used as retail gasoline sales outlets, not the defendant's share of the retail sales market." 540 F.Supp. at 816. It then held that sufficient economic power did *not* exist. Because the misapplied *Blackwell* opinion is the only "evidence" presented by Yonkers, we must hold that the court below was eminently correct in saying that sufficient economic power has not been shown to exist.

On these grounds, the order of the district court granting the preliminary injunction is

*Affirmed.*[10]

---

**10.** Appellee seeks damages and double costs under F.R.A.P. 38, but we do not consider this appeal frivolous within the import of that rule.

Appellee may, of course, have its costs under F.R.A.P. 39(a).