THIS OPINION IS A
PRECEDENT OF THE TTAB

Mailed:
6 March 2008

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

Trademark Trial and Appeal Board

_____

In re Supply Guys, Inc.

_____

Serial Nos. 77027094, 77027097, and 77027099

_____

Richard H. Kosakowski of O'Shea, Getz & Kosakowski, P.C.
for Supply Guys, Inc.

Mary Boagni, Trademark Examining Attorney, Law Office 114
(K. Margaret Le, Managing Attorney).

_____

Before Drost, Zervas, and Wellington, Administrative
Trademark Judges.

Opinion by Drost, Administrative Trademark Judge:

On October 23, 2006, Supply Guys, Inc. (applicant)

filed the following three applications to register the mark

LEADING EDGE TONERS in standard character form on the

Principal Register:

> Serial No. 77027094
> Class 2
> Toner; Toner cartridges
> "Toners" disclaimed
>
> Serial No. 77027097
> Class 16
> Ink sticks
> "Toners" disclaimed
>
> Serial No. 77027099

Class 9
Components for laser toner cartridges, namely,
replacement drums and rollers; printer parts, namely,
fusers, volt fusers, fuser rolls, transfer rollers,
transfer belts, transfer kits each consisting of a
transfer belt, a transfer roller and air filters, sold
as a unit, transfer units, paper trays, maintenance
kits each consisting of a fusing assembly, a transfer
roller, a tool for removing a transfer roller, a tray,
a pickup roller, feed rollers, and separation rollers,
sold as a unit, maintenance trays, drum maintenance
trays, drum maintenance kits each consisting of an
imaging drum cartridge, a large air filter, a small
air filter, and a hand wipe, sold as a unit, imaging
kits each consisting of replacement imaging units,
sold as a unit, imaging units, main charge grids, belt
cleaner assemblies, waste cartridges, waste trays
"Toners" disclaimed

Two applications ('097 and '099) allege June 2, 2006, as their dates of first use and first use in commerce. The '094 application alleges June 6, 2006, as its dates of first use.

The examining attorney has refused registration on the ground that applicant's mark as shown on each specimen does not function as a trademark for the identified goods and that applicant has failed to submit "an acceptable substitute specimen showing proper trademark use for the goods specified in the application" with the appropriate verified statement (Brief at 1). 15 U.S.C. §§ 1051, 1052 and 1127. We have set out the specimens from Serial No. 77027094. The first specimen is the substitute specimen. The second is the original specimen.



We add that the original specimen (the FedEx shipping label) from the '094 application appears to be identical to the specimens from the other two applications. The

recipient is identified as Brian Zuckerman of 226 Russell Street, Hadley, MA 01035. Coincidentally, Brian A. Zuckerman is identified as applicant's president and applicant's address in the application is identical to Mr. Zuckerman's address on the original specimen.

The substitute specimens in the three cases are similar, although the center of the specimens display different goods and the items listed under "Bestsellers" are different.

Because the specimens and issues are so similar, we have chosen to issue one opinion that addresses applicant's three applications.

Arguments

The examining attorney argues that the "original specimen submitted by the applicant consists of a copy of a shipping label depicting the mark in the return address." Brief at unnumbered p. 3.[1] Furthermore, the examining attorney contends that shipping labels are not acceptable "if the mark as shown, as in this case, is merely used as a trade name, and not as a trademark." Brief at 6.

Regarding the substitute specimen, the examining attorney argues that "despite the existence of any pictures

---

[1] Unless otherwise specified, references to the record will be to the record to the '094 application.

4

or ordering information on the webpage, the mark is not used in a manner that would identify the goods, but instead appears to identify a retail website called LEADING EDGE TONERS." Brief at 11.

Applicant maintains that on the original specimens, the mark "is used in a trademark sense on the original specimen because the customers associate that mark with the distinctive products they obtain thereunder. Therefore, the mark does not solely function as a business name, if at all." Brief at 8.

For the substitute specimens, applicant points to six locations (Reply Brief at 5-6) on the specimen[2] where the words LEADING EDGE TONERS appears:

Location 1: As part of the website address in the URL line

Applicant argues that the "owner of a mark for goods who sells those goods over the Internet and who uses its trademark as part of the URL must necessarily use that mark in a manner mandated by the rules of the Internet; for example, www.microsoft.com."

Location 2: In the top left hand corner where it indicates "Leading Edge Toners Best Prices for Tektronix Toners and Xerox Ink/Tektronix Phaser 560P"

---

[2] Regarding two of the uses on the substitute specimen where the mark is used with the copyright notice and with applicant's phone number, applicant assumed "without admitting" that the use was solely as a trade name. Reply Brief at 5.

Location 3:  In the upper half on the left side where it indicates "Leading Edge Toners™, where directly underneath the word "edge" is a picture of a toner cartridge and directly to the right is a picture of a printer, while underneath the mark are the words "The Price Leader for Xerox/Tektronix Toner."

Applicant argues that there "is no rule or convention that use of a mark on the top of a webpage is ordinarily in a location where the name of the on-line retail or ordering services [is] located."  Reply Brief at 9; see also p. 10. "[I]t is submitted that the mark and the picture of the goods are in sufficiently close proximity to allow one to easily associate the mark with the goods."  Reply Brief at 10; see also p. 11.

Location 4: In the middle left side of the substitute specimen where it indicates "Leading Edge Toners Best Price for Tektronix Toners and Xerox Ink" and directly below this, separated by only the words "High-Capacity Toner" on one line and on another line below that the words "Phaser 560/740 Media Sciences compatible…" is a picture of a toner cartridge.

For this use, applicant argues that the use "is relatively very close to a picture of the goods, so much so that it allows one to easily associate the mark with the goods."  Reply Brief at 13.

Discussion – Original Specimen

Regarding applicant's FedEx shipping label, we agree with the examining attorney that the label does not demonstrate good trademark use.  "The name of a business or

6

company is a trade name and there is no provision in the Trademark Act for registration of trade names which are used solely as trade names. However, if a trade name is used in such a manner that it also functions as a trademark or service mark, it may be registrable." *In re Stewart Sandwiches International, Inc.*, 220 USPQ 93, 94 (TTAB 1983) (citations omitted). "The question of whether a name used as a trade name… also performs the function of a trademark and/or a service mark is one of fact and is determined from the manner in which the name is used and the probable impact thereof upon purchasers and prospective customers." *In re Univar Corp.*, 20 USPQ2d 1865, 1866 (TTAB 1991).

In this case, the specimen only shows use of the term LEADING EDGE TONERS in the "Ship From" section of the label where it serves as a return address. The specimen does not indicate that the term LEADING EDGE TONERS is used as a trademark. *See, e.g., In re Walker Process Equipment Inc.*, 233 F.2d 329, 110 USPQ 41, 43 (CCPA 1956) ("[E]ach of the specimens includes the words 'Aurora Illinois' or 'Aurora Ill. U.S.A.' displayed in such a manner as to make it clear they indicate the location of Walker Process Equipment Inc."); *In re Lyndale Farm*, 186 F.2d 723, 88 USPQ 377, 381-82 (CCPA 1951) ("Furthermore, the inference is created by the addition of the address 'Floydada, Texas' to the

7

placard that the use here involved does not so much distinguish appellant's cattle as it identifies appellant as the source of the shipment while the crate and its contents are in transit. That is trade name usage as distinguished from trade mark usage. We think the denial of registration of 'Lyndale Farm' on the principal register because of failure to show trade mark usage is, on the record before us, well founded"). As the CCPA has held: "[T]he mere fact that appellant's goods are placed in bags (bearing the words sought to be registered) during a particular phase of the transportation process does not, ipso facto, establish trademark usage of those words." *In re The Pennsylvania Fashion Factory, Inc.*, 588 F.2d 1343, 200 USPQ 140, 142 (CCPA 1978). Applicant's use of its trade name on a shipping label similarly does not by itself create trademark use. *In re Reinforced Molding Corporation*, 152 USPQ 820, 821 (TTAB 1967) ("Since the corporate name is being used with applicant's address and in a subordinate manner, the immediate suggestion is that it is not being used as a trademark").

Even more so in this case, applicant's term appears in the return address of a shipping label where customers look for the name of the individual, organization, or company

that shipped the package. *See In re Baker Industries,*

*Inc.*, 565 F.2d 1211, 196 USPQ 151, 151-52 (CCPA 1977):

> During the prosecution, appellant presented specimens,
> postal meter mailing tapes, which showed the actual
> use of the words in commerce. The mailing tapes are
> affixed to packages in which appellant's goods are
> mailed. The words, which appellant argues are in the
> nature of a slogan, are used on the packages in
> conjunction with appellant's trade name, Baker
> Industries… [W]e conclude that appellant's slogan does
> not identify and distinguish its goods in accordance
> with the statutory definition of "trade-mark," but,
> rather, serves to distinguish appellant from other
> companies having the name, Baker.

Applicant has not submitted evidence that convinces us that

customers would understand that the name in the return

address, which normally identifies the name of the entity

that shipped the contents of the package, functions in

applicant's case also as a trademark for the unidentified

goods inside the package. Unlike the specimens in *Univar*,

20 USPQ2d at 1869, the original specimens here use the term

as the complete return address of applicant with no

distinctive stylization other than the use of uppercase

letters. Therefore, we agree with the examining attorney

that the original specimens do not demonstrate trademark

use for the goods in the three applications in this appeal.

Discussion - Substitute Specimen

       The next question is whether the substitute specimens

show good trademark use. Unlike the original specimens,

9

there are several uses of the term LEADING EDGE TONERS on the substitute specimens. The Trademark Act § 1(a)(1) (15 U.S.C. § 1051(a)(1)) requires an applicant who is the owner of a trademark used in commerce to file "such number of specimens or facsimiles of the mark as used as may be required by the Director." For goods, a "mark shall be deemed to be in use in commerce … [when] it is placed in any manner on the goods or their containers or the displays associated therewith or on the tags or labels affixed thereto … [and] the goods are sold or transported in commerce." Section 45, 15 U.S.C. § 1127. The Office currently requires the submission of one specimen with use-based applications (37 CFR § 2.56(a)) and it defines a trademark specimen as "a label, tag, or container for the goods, or a display associated with the goods." 37 CFR § 2.56(b)(1).

Applicant and the examining attorney both discuss the case of *Lands' End Inc. v. Manbeck*, 797 F. Supp. 311, 24 USPQ2d 1314 (E.D. Va. 1992), which illustrates one way an applicant can comply with the provisions discussed above, and whether it applies to the case at hand. Applicant argues that "based on the line of decisions beginning with *Lands' End* in 1992, the Board has consistently held that images of web pages when used as an electronic display meet

10

the specimen requirements as provided for in the TMEP and
the Trademark Rules." Brief at 13. The examining attorney
argues (Brief at 11) that "despite the existence of any
pictures or ordering information on the webpage, the mark
is not used in a manner that would identify the goods, but
instead appears to identify a retail website called LEADING
EDGE TONERS. Essentially, the mark used on the specimen
identifies *services*, thereby failing to meet the
fundamental requirement in the *Land's End* case that the
mark be associated with the goods."

The TMEP also sets out factors for examining attorneys
to follow when considering whether catalogs and other
specimens are acceptable:

> Accordingly, examining attorneys may accept any
> catalog or similar specimen as a display associated
> with the goods, provided: (1) it includes a picture of
> the relevant goods; (2) it shows the mark sufficiently
> near the picture of the goods to associate the mark
> with the goods; *and* (3) it includes the information
> necessary to order the goods (*e.g.*, an order form, or
> a phone number, mailing address, or e-mail address for
> placing orders).

> However, the mere inclusion of a phone number,
> Internet address and/or mailing address on an
> advertisement describing the product is not in itself
> sufficient to meet the criteria for a display
> associated with the goods. There must be an offer to
> accept orders or instructions on how to place an
> order. *In re MediaShare Corp.*, 43 USPQ2d 1304 (TTAB
> 1997) (fact sheet brochures held not to qualify as a
> catalog under *Lands' End,* where the specimen failed to
> show the mark near a picture of the goods, and
> included no information as to how to order the goods).

11

> It is not necessary that the specimen list the price of the goods.

TMEP § 904.03(h) (5th ed. rev. September 2007).[3]

The TMEP also addresses the question of whether

electronic displays function as a trademark:

> A website page that displays a product, and provides a means of ordering the product, can constitute a "display associated with the goods," as long as the mark appears on the web page in a manner in which the mark is associated with the goods, and the web page provides a means for ordering the goods. The Trademark Trial and Appeal Board has held that web pages that display goods and their trademarks and provide for online ordering of such goods are, in fact, electronic displays which are associated with the goods. Such uses are not merely advertising, because in addition to showing the goods, they provide a link for ordering the goods. In effect, the website is an electronic retail store, and the web page is a shelf-talker or banner which encourages the consumer to buy the product. A consumer using the link on the web page to purchase the goods is the equivalent of a consumer seeing a shelf-talker and taking the item to the cashier in a store to purchase it. The web page is thus a point of sale display by which an actual sale is made. *In re Dell Inc*., 71 USPQ2d 1725 (TTAB 2004)…

> The mark must also be displayed on the webpage in a manner in which customers will easily recognize it is a mark. *In re Morganroth*, 208 USPQ 284 (TTAB 1980). In [*In re Osterberg*, 84 USPQ2d 1220 (TTAB 2007)], the Board found that CONDOMTOY CONDOM was not displayed so prominently that consumers would recognize it as a trademark for condoms.

TMEP § 904.03(i).

---

[3] In its Reply Brief (p. 6), applicant acknowledged the recent change to the TMEP.

Applicant maintains that "the Examining Attorney's Appeal Brief concedes that the substitute specimen includes a picture of the relevant goods, and includes the necessary ordering information, but argues that the mark does not identify the goods." Reply Brief at 6. Thus, the question under *Lands' End* is whether the mark is used in such a manner as to associate the marks with the goods.

We first look at whether the use of the term in the web address is a trademark for the goods. The address is: http://www.leadingedgetoners.com/product.php?productid+7110 1&cat+218&page+1.[4] Applicant argues that just "because the owner of a mark uses its trademark as part of the URL does not create a rigid rule that always leads to the conclusion that the mark used as part of a URL must identify only on-line sales services and not the goods sold on that website." Reply Brief at 8.

Internet addresses, even when used separately from a website, do not necessarily show service mark use much less trademark use for goods sold on the website. *In re Eilberg*, 49 USPQ2d 1955, 1956 (TTAB 1998) ("In other words, the asserted mark WWW.EILBERG.COM merely indicates the location on the Internet where applicant's Web site

---

[4] There are similar addresses in the '097 and '099 applications.

13

appears.  It does not separately identify applicant's legal services as such").

> Like a street address or telephone number, every domain name serves the purely technological function of locating a Web site in cyberspace.  However, a domain name does not become a trademark or service mark unless it is also used to identify and distinguish the source of goods or services.  Out of the millions of domain names, probably only a small percentage also play the role of a trademark or service mark.

*McCarthy on Trademarks and Unfair Competition*, § 7.17.1 (2007) (footnotes omitted).

Here, applicant's use of the term LEADING EDGE TONERS as part of the internet address, www.leadingedgetoners.com, similarly identifies the website where applicant conducts its retail sales services.  Obviously, a website can be used for multiple purposes and the simple fact that a term is used as part of the internet address does not mean that it is a trademark for the goods sold on the website.

Applicant also uses the term LEADING EDGE TONERS in several locations as part of the following phrases:

> 1. Bar at the top of web page:
> Leading Edge Toners Best Prices for Tektronix Toners and Xerox Ink Xerox/Tektronix Phaser 560P
>
> 2. Left upper corner:
> LEADING EDGE TONERS™
> The Price Leader for Xerox/Tektronix Toner
>
> 3. Center of page:
> Leading Edge Toners Best Prices for Tektronix Toners and Xerox Ink

14

The examining attorney argues that each of these uses of the mark on the specimen "appears to merely indicate the name of the applicant's on-line services."  Brief at 12. Applicant maintains that "the substitute specimen with the mark 'LEADING EDGE TONERS' in the upper left corner also includes a picture of the goods, and it is submitted that the mark and the picture of the goods are in sufficiently close proximity to allow one to easily associate the mark with the goods."  Reply Brief at 10.

We must look at the substitute specimen to determine whether applicant's term is used as a trademark to identify its identified goods.  *Compare Dell*, 71 USPQ2d at 1729 (Mark was only listed as the fifth feature in the sentence: "QUIETCASE™ acoustic environment provides easy access to the system interior and supports tool-less upgrades and maintenance of key internal components."  The board determined that "QUIETCASE is sufficiently prominent that consumers will recognize it as a trademark") *with* *Osterberg*, 83 USPQ2d at 1223 ("Unlike the mark in the Dell case where the mark at issue was set out from the surrounding text as the first word in a bullet list, CondomToy condom is not so prominent that consumers will recognize it as a trademark for condoms").  The fact that

15

the term may serve as a service mark to identify retail or online store services does not necessarily show that the term is also a trademark for applicant's goods.

Here, we note that the term LEADING EDGE TONERS is used in phrases where other trademarks, which appear to be owned by third parties, are used to identify the toners and other goods.

> Leading Edge Toners Best Prices for Tektronix Toners and Xerox Ink Xerox/Tektronix Phaser 560P
>
> LEADING EDGE TONERS™
> The Price Leader for Xerox/Tektronix Toner
>
> Leading Edge Toners Best Prices for Tektronix Toners and Xerox Ink

The specimen refers to "Xerox/Tektronix Toner" and "Tektronix Toners." However, applicant argues that:

> Applicant is an authorized distributor of Media Sciences products. It offers low price on many printer supplies including toner cartridges and offers the convenience of purchasing various printer supplies compatible with many different brand name printers from a single source. Furthermore, some manufacturers such as Media Sciences do not sell cartridges directly to consumers. Only authorized distributors such as Applicant make the toner cartridges available to the consumers for purchase.

Reply Brief at 13. *See also* '097 Reply Brief at 14 ("Applicant is an authorized distributor of Media Sciences products") and '099 Reply Brief at 13 ("Applicant is a reseller of Konica/Minolta products").

The '094 application has a picture of what looks like a toner cartridge with the phrase "Phaser 560/740 Media Sciences Compatible Black High-Capacity Toner" above the picture.  Off to the side of the picture is the phrase "Black High-Capacity Toner Cartridge, works with PHASER 560 and PHASER 740.  COMPATIBLE with Tektronix part number…" The '097 application has a picture of a stack of packages. Above the packages is the phrase "Phaser 8400 Media Sciences Compatible Value Bundle."  Off to the side of the picture is the phrase:  "The value bundle contains these Media Sciences compatible ink sticks."  The '099 application has a picture, apparently of a drum kit, with the phrase "Minolta-OMS 2300 Drum Kit" above the picture and the phrase "Drum Kit for Minolta-QMS…" to the side of the picture.

A retailer that sells the goods of others does not necessarily have a trademark for those goods.  Applicant relies on the case of *Power Test Petroleum Distributors, Inc. v. Calcu Gas, Inc*., 754 F.2d 91, 225 USPQ 368 (2d Cir. 1985).  Unlike this ex parte trademark appeal, that case involved a preliminary injunction in an antitrust case where the defendant alleged that the trademark it licensed was an illegal tying arrangement.  The Court pointed out that the "manufacturer-purchaser distinction is not

17

controlling… This says that a trademark owner may affix his trademark to a product manufactured for him, or that the product need not be one he manufactures."  225 USPQ at 373. More specifically, *Power Test* involved a distributor who purchased gasoline from various sources and petroleum-related products and distributed them to its franchised service stations with its trademark.  The case certainly confirms that a distributor may use its own trademark on the goods that it distributes.  *In re Los Angeles Police Revolver and Athletic Club Inc.*, 69 USPQ2d 1630, 1634 (TTAB 2003) ("[T]he mere fact that applicant is the distributor of goods is not necessarily fatal to its claim of ownership of the mark").

Furthermore, it is not disputed that a product may contain more than one trademark, including a trademark of the distributor as well as the manufacturer.  *Safe-T Pacific Company v. Nabisco, Inc*., 204 USPQ 307, 315 (TTAB 1979 ("The principle can be extended one step further to allow the inclusion on the product of the distributor's trademark and trade name along with the manufacturer's trademark so long as the effect thereof upon customers and prospective customers is not to confuse them as to the source of the goods or to obliterate the distinction

18

between the distributor and the manufacturer which is necessary to give validity and vitality to this concept").

However, the question in this case is whether applicant's use of the term on its website functions as a trademark for the goods it sells on that site. There is no refusal in this case involving whether applicant's term functions as a service mark for its retail services because there are no services listed in these applications. The mere fact that applicant is a retailer selling products of others does not by itself establish that applicant's mark, which may function as its trade name or service mark, necessarily also functions as a trademark for the goods applicant sells. *See Vornado Inc. v. Oshkosh B'Gosh, Inc.*, 169 USPQ 500, 501 (TTAB 1971) (citation omitted):

> A mark or name identifying retail department store services identifies, in effect, the establishment or stores of the owner of such mark or name. In the particular case "TWO GUYS" identifies opposer's discount stores but it does not identify the goods purchased in the stores of opposer. Certainly a merchant can use a mark to identify goods as originating with him. There is no proof, however, that opposer applies "TWO GUYS" as a mark to identify any goods.

At this point, it may be important to step back and consider the statutory framework within which we operate. Congress has specifically provided for the registration of several types of marks. In this case, we are concerned

19

with two of them, trademarks and service marks. A "trademark" is used by a person "to identify and distinguish his or her goods, including a unique product, from those manufactured or sold by others and to indicate the source of the goods, even if that source is unknown." 15 U.S.C. § 1127. A "service mark" is used by a person "to identify and distinguish the services of one person, including a unique service, from the services of others and to indicate the source of the services, even if that source is unknown." *Id.*[5] Congress has also required that an applicant, in most cases, provide specimens of its use of the mark in commerce prior to registration. For goods, the mark is used in commerce when it is "placed in any manner on the goods or their containers or the displays associated therewith or on the tags or labels affixed thereto." *Id.* For services, a mark is used in commerce "when it is used or displayed in the sale or advertising of services and the services are rendered in commerce." *Id.*

Congress has specifically recognized the difference between trademarks and service marks. A mark may serve both as a trademark and service mark (or a trade name).

---

[5] For the sake of completeness, we add that a trademark or service mark includes "any word, name, symbol, or device, and any combination thereof" and, of course, it includes trademarks or service marks for which a person has a bona fide intention to use the mark in commerce. 15 U.S.C. § 1127.

20

While we agree with applicant that there are no rigid rules that would require that use of a term in various locations on specimens results in the use not being trademark use, on the other hand, there is no per se rule that any use of a mark on a website is trademark use for all goods sold on that web page. The specimens in cases such as *Lands' End* and *Dell* displayed a purse that consumers would identify by the trademark KETCH and a computer system with an internal case that was identified by the trademark QUIETCASE. Even the specimens in the recent case of *In re Valenite Inc.*, 84 USPQ2d 1346 (TTAB 2007) provided customers a means of "ordering of VALPRO systems and components requir[ing] careful calculation and technical knowledge." 84 USPQ2d at 1348. *Valenite* did not involve a distributor of the products of others that was claiming trademark use based on a display of those goods on its website. More importantly, the term VALPRO in *Valenite* pointed to the applicant's goods. In this case, applicant's LEADING EDGE TONERS points to applicant being a distributor of goods of other parties and/or the services of distributing those goods, e.g., "Leading Edge Toners Best Prices for Tektronix Toners" and "The Price Leader for Xerox/Tektronix Toner."

We do not see anything in *Lands' End*, *Dell*, or even *Valenite* that indicates that the distinction between goods

21

and services has been breached.  The USPTO has long

recognized such a distinction and it has registered terms

based on what the evidence showed the goods or services

were.

> Starting in about 1958, the Patent and Trademark
> Office began granting service mark registrations to
> retailers of merchandise for services such as "retail
> grocery store services," "retail department store
> services," and the like.  This policy is now
> officially recognized in the Trademark Manual of
> Examining Procedure, which states that:  "[A]t one
> time the activities of grocery stores, department
> stores, and similar retail stores were not considered
> to be services.  However, it is now recognized that
> gathering various products together, making a place
> available for purchasers to select goods, and
> providing any other necessary means for consummating
> purchases constitutes the performance of a service."
> Marks, which identify such services, are registerable
> as service marks.  Problems as to whether such a
> service is merely ancillary to the sale of goods or to
> another service are discussed elsewhere in this
> treatise.

*McCarthy on Trademarks and Unfair Competition* 16:47 (2007).

> The board has held that:
>
> It is a matter of common knowledge that retail
> department store services encompass the sale of
> clothing including men's and boys' slacks but it is
> also a matter of common knowledge that goods sold in
> department stores are more frequently than not
> identified by the trademarks of the producers of the
> merchandise.

*Vornado*, 169 USPQ at 501.

Retail stores can sell products under their own brand

name that is the same as the store's name or they can sell

goods produced by others.  The names of these stores

22

normally identify the "discount stores but it does not identify the goods purchased in the stores of opposer." *Id.* However, if a retail store also uses the name of the store on the goods themselves, the same mark can serve both a trademark and service mark function. *Giant Food Inc. v. Rosso and Mastracco, Inc.*, 218 USPQ 521, 524 (TTAB 1982) ("The word 'GIANT' appears on several hundred products marketed in opposer's stores"). The mere fact that the name of a store appears on the sign outside or inside the store does not convert the service mark into a trademark for all the goods that are sold in those stores. In the same way, even if applicant is an authorized distributor of others' toner cartridges, this fact does not make applicant's service mark into a trademark for the manufacturers' goods.

The fact that applicant displays its mark on a website instead of on the outside or inside of the store does not mean that it is more likely to serve as a trademark for the goods sold on the site. We must look to the perception of the ordinary customer to determine whether the term functions as a trademark. *In re Bailey Meter Co.*, 128 USPQ 292, 293 (TTAB 1961) ("It is well established, however, that a package, like a configuration of an article or dress of the goods, cannot be registered, even on the

Supplemental Register, unless the adoption thereof results from an intention primarily to indicate origin of the goods rather than from considerations of utility and function, and it is of such nature that the ordinary purchaser would be likely to regard it as indicating such origin"). *See also In re Standard Oil Co.*, 275 F.2d 945, 125 USPQ 227, 229 (CCPA 1960) ("Before there can be registrability, there must be a trademark (or a service mark) and, unless words have been so used, they cannot qualify for registration") and *Morganroth*, 208 USPQ at 288 ("This necessitates a determination as to whether it is used and provided in such a manner so as both to make it known to purchasers and to have such individuals associate it with the goods as an identification symbol").

Looking at all the multiple uses of the term LEADING EDGE TONERS on the specimens, including the original specimens, and considering them individually and their entire impression, we cannot conclude that purchasers would understand that the term LEADING EDGE TONERS is used as a trademark for the goods identified in the three applications. Rather, the uses point to the fact that Leading Edge Toners is a retail/distributor of toner and similar products of others. Therefore, we agree with the examining attorney that the term does not function as a

trademark for the goods in the subject applications. The term fails to associate the mark with the goods as required by *Lands' End*.

Decision: The examining attorney's refusals to register the term LEADING EDGE TONERS in Serial Nos. 77027094, 77027097, and 77027099 on the ground that it is used as a trade name and that the specimens fail to show that the mark is used as a trademark for the identified goods are affirmed.